# Exhibit A

 **CT Corporation**

**Service of Process Transmittal**
07/24/2009
CT Log Number 515187561

**TO:**  Tom Boardman
3M Company
Legal Dept., 3M Center
Bldg 220-9E-02
Saint Paul, MN 55144-1000

**RE:**  **Process Served in Florida**

**FOR:**  3M Company (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Emerald Coast Utilities Authority, Pltf. vs. 3M Company, et al., Dft. |
| **DOCUMENT(S) SERVED:** | Summons, Complaint, Attachments |
| **COURT/AGENCY:** | Escambia County Circuit Court, FL<br>Case # 2009 CA 002177 |
| **NATURE OF ACTION:** | Product Liability Litigation - Design, manufacture, formulation, marketing, promotion, distribution and/or sale of PFOA/PFOS Contaminants that have an continue to contaminate Pltf.'s wells and drinking supply - Seeking injunctive and equitable relief and award of compensatory damages |
| **ON WHOM PROCESS WAS SERVED:** | C T Corporation System, Plantation, FL |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 07/24/2009 at 08:30 |
| **APPEARANCE OR ANSWER DUE:** | Within 20 days after service, exclusive of the day of service |
| **ATTORNEY(S) / SENDER(S):** | James M. Corrigan<br>James Martin Corrigan, P.A.<br>700 S. Palafox St.<br>Ste. 220<br>Pensacola, FL 32502<br>850-434-9999 |
| **ACTION ITEMS:** | Telephone, Tom Boardman , 651-733-1430<br>*Left voice mail for Kathy Jasperson*<br>SOP Papers with Transmittal, via  Fed Ex 2 Day , 790182246074<br>Image SOP<br>Email Notification, Kathy Jasperson KMJASPERSON@MMM.COM<br>Email Notification, Sheryl Arneson SMARNESON@MMM.COM |
| **SIGNED:** | C T Corporation System |
| **PER:** | Donna Moch |
| **ADDRESS:** | 1200 South Pine Island Road<br>Plantation, FL 33324 |
| **TELEPHONE:** | 954-473-5503 |

Page 1 of  1 / BH

Information displayed on this transmittal is for C T Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

**IN THE CIRCUIT COURT OF THE FIRST JUDICIAL CIRCUIT,
IN AND FOR ESCAMBIA COUNTY, FLORIDA**

EMERALD COAST UTILITIES AUTHORITY
     **Plaintiff(s),**

VS.                **Case No.**   2009 CA 002177
                         **Division:**   B

3M COMPANY , et al.
     **Defendant(s).**

*7-24-09  830AM*
*BK 477*

**S U M M O N S**

THE STATE OF FLORIDA:

To Each Sheriff of the State:

     YOU ARE COMMANDED to serve this summons and a copy of the complaint in the above

styled cause upon the defendant 3M COMPANY . *c/o CT corp, 1200 S. Pine Island Road, Plantation, FL 33324*

     Each defendant is required to serve written defenses to said complaint on plaintiff's attorney

JAMES M. CORRIGAN, whose address is 700 SOUTH PALAFOX STREET SUITE 220

PENSACOLA, FL 32502 within 20[1] days after service of this summons upon you, exclusive of the day

of service, and to file the original of said written defenses with the Clerk of this Court either before

service on plaintiff's attorney or immediately thereafter. If you fail to do so, a default will be entered

against you for the relief demanded in the complaint.

     WITNESS my hand and the seal of this Court on July 8, 2009.

                         ERNIE LEE MAGAHA, Clerk
                         Circuit & County Courts

(seal)

                         By: _____
                               Deputy Clerk

*10082*

---

[1] Except when suit is brought pursuant to section 768.28, Florida Statutes, if the State of Florida, one of its agencies, or one of its officials or employees sued in his or her official capacity is a defendant, the time to be inserted as to it is 40 days. When suit is brought pursuant to section 768.28, Florida Statutes, the time to be inserted is 30 days.

IN THE CIRCUIT COURT FOR THE FIRST JUDICIAL CIRCUIT
IN AND FOR ESCAMBIA COUNTY, FLORIDA

FE... .. MAGAHA
.. CIRCUIT COURT
ESC... ... COUNTY, FL

2009 JUL -8 P 2: 31

**EMERALD COAST
UTILITIES AUTHORITY**

CIRCU  ...IL DIVISION
FILED .. RECORDED

**COMPLAINT**

    **Plaintiff,**

**Docket No.: _____**

    **vs**

**3M COMPANY; E.I. DUPONT DE
NEMOURS AND COMPANY;
SOLUTIA, INC.; and FIRE RAM
INTERNATIONAL, INC.**



    **Defendants.**
_____x

    Plaintiff Emerald Coast Utilities Authority hereby alleges as follows, based on

information and belief and investigation of counsel:

## I.  SUMMARY OF THE CASE

1.     Plaintiff EMERALD COAST UTILITIES AUTHORITY owns and/or operates public

    drinking water systems and supplies drinking water to hundreds of thousands of residents

    and businesses in various locations throughout Pensacola and Escambia County, Florida.

2.     The toxic chemicals perfluorooctanoic acid ("PFOA") and perfluorooctane sulfonate

    ("PFOS") are contaminating and damaging these drinking water systems and supply

    wells.

3.     Plaintiff seeks to recover the costs necessary to protect the public by restoring its

    damaged drinking water systems and supply wells that have been, and continue to be,

    contaminated by PFOA and PFOS.

4.    Both PFOA and PFOS are highly toxic substances that are used in or are breakdown products of a variety of products including fire retardant foams.

5.    Aqueous Film-Forming Foam ("AFFF") is a widely popular product used to control aviation, marine, and shallow spill fires. AFFF is made with chemicals that synthesize and/or degrade into PFOA and/or PFOS. AFFF is the specific product manufactured by defendant 3M Company ("3M") that was used, released, discharged, and/or disposed of in the vicinity of certain drinking water production wells owned and/or operated by Plaintiff ("Plaintiff's Wells"), allowing PFOA and PFOS to migrate through the subsurface and into the groundwater, thereby contaminating the water sources and drinking water pumped from Plaintiff's wells.

6.    Like 3M, defendants E.I. DuPont de Nemours and Company ("DuPont") and Fire Ram International, Inc. ("Fire Ram") also produced, distributed, marketed, and/or sold AFFF that was used, released, discharged, and/or disposed of near Plaintiff's Wells. Further, both DuPont and Solutia, Inc. ("Solutia") manufactured and sold products containing Teflon®, Zonyl®, Foraperle®, Tefzel®, and other non-stick products (collectively "Non-Stick Products"), all of which are popular with household consumers, paper and textile manufacturers, and, among others, stain-resistant carpet manufacturers, for their non-stick qualities. Like AFFF, Non-Stick Products are made with chemicals that synthesize and/or degrade into PFOA and/or PFOS, and were used, released, discharged, and/or disposed of in the vicinity of Plaintiff's wells, allowing PFOA and PFOS to contaminate drinking water.

---

COMPLAINT FOR DAMAGES AND OTHER RELIEF (PFOA & PFOS CONTAMINATION) - PAGE 2

7.    Both PFOA and PFOS are highly soluble in water, not easily biodegradable, and persistent in the environment. Both are known animal carcinogens and likely human carcinogens.

8.    The defendants in this action are the manufacturers, distributors, and retailers of AFFF and Non-Stick Products that contain and/or degrade into PFOA and/or PFOS (collectively "PFOA/PFOS Contaminants"). Among other things, Defendants knowingly and willfully manufactured, marketed, and sold PFOA/PFOS Contaminants when they knew or reasonably should have known that PFOA and/or PFOS would reach groundwater, pollute drinking water supplies, render drinking water unusable and unsafe, and threaten the public health and welfare, as it has done in this case.

9.    Plaintiff files this lawsuit to recover compensatory and all other damages including, but not limited to, all necessary funds to compensate Plaintiff for the costs of designing, constructing, installing, operating, and maintaining the treatment facilities and equipment required to comply with federal safe drinking water advisories and to remove PFOA and PFOS from the drinking water it supplies to the public.

## II.  PARTIES

### Plaintiff

10.   Plaintiff is a public water provider organized under the laws of the State of Florida that is charged with owning, managing, financing, and improving the water and wastewater systems of Escambia County and the City of Pensacola. Each of Plaintiff's water systems includes, among other elements, drinking water production wells that draw from groundwater aquifers, and associated pumping, storage, treatment and distribution facilities and equipment. Plaintiff has significant property interests in the water it

appropriates and uses from its wells as well as in the groundwater and aquifers that

supply the wells.

**Defendants**

11.    The following defendants designed, manufactured, formulated, marketed, promoted,

distributed, and/or sold (directly or indirectly) the PFOA/PFOS Contaminants that have

contaminated and continue to contaminate Plaintiff's Wells and drinking water supply:

    a.    Defendant 3M COMPANY ("3M") is a Delaware corporation with its principal place of business in St. Paul, Minnesota, which at all times relevant to this action was doing business in Florida.  Service may be effectuated by serving its registered agent, CT Corporation System, 1200 S. Pine Island Road, Plantation, FL 33324; and,

    b.    Defendant E.I. DUPONT DE NEMOURS AND COMPANY ("DuPont") is a Delaware corporation with its principal place of business in Wilmington, Delaware, which at all times relevant to this action was doing business in Florida. Service may be effectuated by serving its registered agent, CT Corporation System, 1200 S. Pine Island Road, Plantation, FL 33324.

    c.    Defendant SOLUTIA, INCORPORATED ("Solutia") is a Missouri corporation. At all times relevant to this action, Solutia regularly conducted business in the state of Florida and manufactured products at its facility located at 3000 Old Chemstrand Road, Cantonment, Florida, 32533 that either contain or degrade into PFOS and/or PFOA.  Service may be effectuated by serving its registered agent, CT Corporation System, 1200 S. Pine Island Road, Plantation, FL 33324.

    d.    Defendant FIRE RAM INTERNATIONAL, INCORPORATED ("Fire Ram") is a Florida corporation with its principal place of business in Sunny Isles Beach, Florida, which at all times relevant to this action was doing business in Florida. Service may be effectuated by serving its registered agent, William Q. Schilling, 222 Poinciana Drive, Sunny Isles Beach, FL, 33160-4518.

12.    Any and all references to a Defendant or Defendants in this Complaint include any

predecessors, successors, parents, subsidiaries, affiliates and divisions of the named

Defendants.

13.    When the term "Defendants" is used alone, it refers to all Defendants named in this

Complaint jointly and severally.  When reference is made to any act or omission of the

Defendants, it shall be deemed to mean that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or control of the affairs of Defendants, and did so while acting within the scope of their employment or agency.

### III. JURISDICTION AND VENUE

14. This Court has jurisdiction over Defendants because they are either Florida corporations authorized to do business in Florida, are registered with the Florida Secretary of State, do sufficient business with sufficient minimum contacts in Florida, or otherwise intentionally avail themselves of the Florida market through the sale, manufacturing, distribution and/or processing of PFOA/PFOS-related products in Florida to render the exercise of jurisdiction over Defendants by the Florida courts consistent with traditional notions of fair play and substantial justice. There is no diversity of citizenship in this action.

15. Venue is proper in this Court because at least one of the transactions giving rise to these causes of action – the actual or threatened contamination of Plaintiff's property by PFOA and/or PFOS – took place in Escambia County.

16. The amount of damages exceed the minimum jurisdictional limits of this Court.

### IV. ALLEGATIONS APPLICABLE TO ALL CAUSES OF ACTION

#### THE PRODUCTS

#### AFFF

17. Aqueous Film-Forming Foam ("AFFF") is a water-based foam that was first developed in the 1960's to extinguish flammable liquid fuel fires at airports, among other places.

---

18. Defendants 3M, DuPont, and Fire Ram produced, marketed, and/or sold AFFF containing and/or degrading into PFOA and/or PFOS in and around Escambia County, Florida.

**NON-STICK PRODUCTS**

19. Tetrafluoroethylene polymers, or DuPont Teflon®, is a friction coefficient coating developed in 1938 by DuPont. It is utilized in many household applications, most notably as non-stick surface in cookware. Applications also include, but are not limited to, surgical implant coating, fabric protector, and insulator in electrical applications.

20. DuPont Zonyl® is a fluoroadditive used in a number of products including, but not limited to, floor wax, films, paper and paperboard, granite, marble, tile, brick and other porous products for oil repellency and water resistance.

21. DuPont Foraperle® is a fluorinated acrylic copolymer used for the treatment of paper, paperboard, and leather for grease and oil resistance and water and alcohol repellency.

22. Ethylene TetrafluoroEthylene (ETFE), or DuPont Tefzel®, is a fluoropolymer used in a number of products including, but not limited to, wire and cable insulation and jacketing, gasket seals, films for food packaging, and pharmaceutical packaging.

23. Defendants DuPont and Solutia produced, marketed, and/or sold Teflon®, Zonyl®, Foraperle®, Tefzel®, or other non-stick products, and/or used these chemicals in manufacturing other products, all of which contained and/or degraded into PFOA and/or PFOS in and around Escambia County, Florida.

**THE CONTAMINANTS: PFOA & PFOS**

24.    For decades, Perfluorooctanoic acid ("PFOA"), a fluorinated toxin, and

Perfluorooctanoic sulfonate ("PFOS"), a toxic, organic compound, have been used in or

were a byproduct of AFFF and Non-Stick Products.

25.    PFOA and PFOS are manmade chemicals. Both are highly water soluble, persistent in

the environment, and resistant to biologic, environmental, or photochemical degradation.

26.    Defendants have a long history of manufacturing products made from PFOA and/or

PFOS. Based on information and belief, as early as the 1940's-1950's, Defendants 3M,

DuPont, and Solutia used PFOA and PFOS or chemicals that fuse or degrade into

PFOA/PFOS in their manufacturing processes.

27.    Based on information and belief, over the next 50 years, studies emerged showing

negative health effects caused by exposure to PFOA and PFOS.

28.    Based on information and belief, in 2000, under pressure by the Environmental

Protection Agency ("EPA"), 3M announced that it was phasing out PFOS and U.S.

production of PFOS; 3M's PFOS-based AFFF production did not fully phase out until

2002.

29.    DuPont continued their PFOA/PFOS and PFOA/PFOS-based product production and, in

2004, the EPA filed suit against DuPont for PFOA contamination in West Virginia and

Ohio for, among other things, DuPont's failure to disclose the hazards of PFOA.

30.    In December, 2006, the EPA announced that it was fining DuPont $16.5 million for not

disclosing studies showing that Teflon® and other PFOA/PFOS-based products

contaminate drinking water. This was the *largest* administrative fine that the EPA has

ever levied.

## REGULATORY STANDARDS APPLICABLE TO PFOA AND PFOS

31.    No federal or state agency has approved PFOA or PFOS as additives to drinking water. No federal or state agency has approved releasing or discharging PFOA or PFOS into groundwater.

32.    The EPA has issued Provisional Health Advisory Values for PFOA of 0.4 parts per billion (ppb) and 0.2 ppb for PFOS.

## DEFENDANTS' KNOWLEDGE OF PFOA AND PFOS HAZARDS

33.    On information and belief, in the early 1980's or even earlier, Defendants knew, or reasonably should have known, among other things, that: (a) PFOA and PFOS are toxic; and, (b) when applied, discharged, disposed of, or otherwise released into or onto land, PFOA and PFOS readily migrate through the subsurface, mix easily with groundwater, resist natural degradation, render drinking water unsafe and/or non-potable, and can be removed from public drinking water supplies only at substantial expense.

34.    Defendants also knew or reasonably should have known that PFOA and PFOS could be absorbed into the lungs and gastrointestinal tract, potentially causing severe damage to the liver, kidneys, and central nervous system, in addition to other toxic effects, and that PFOA and PFOS are known carcinogens that cause genetic damage.

35.    Defendants 3M, DuPont, and Fire Ram knew or should have known that: (a) users of AFFF would likely include airports and their personnel; (b) airport personnel were foreseeable users of AFFF containing or degrading into PFOA and/or PFOS in both training and real-life situations; (c) PFOA and PFOS are dangerous to the environment and human health if allowed to runoff or drain into groundwater; (d) airport personnel in Escambia County, Florida, foreseeably lacked knowledge of these dangers; and, (e)

airport personnel would require warnings of these dangers and/or affirmative instructions in the use of AFFF.

36.    Defendants DuPont and Solutia knew or should have known that: (a) users of Non-Stick Products would likely include household consumers and paper, textile, and stain-resistant carpet manufacturers and their employees; (b) household consumers and paper, textile, and stain-resistant carpet manufacturers were foreseeable users of Non-Stick Products containing or degrading into PFOA and/or PFOS; (c) PFOA and PFOS are dangerous to the environment and human health if allowed to runoff or drain into groundwater; (d) these consumers and employees of Escambia County, Florida manufacturers foreseeably lacked knowledge of these dangers; and, (e) these consumers and employees would require warnings of these dangers and/or affirmative instructions in the use of Non-Stick Products.

37.    Notwithstanding this knowledge, Defendants negligently and carelessly: (1) designed, manufactured, marketed, and/or supplied PFOA/PFOS Contaminants, (2) issued instructions on how AFFF and/or Non-Stick Products should be used and disposed of (the former, by washing the foam into the soil), thus improperly permitting PFOA and/or PFOS to contaminate the groundwater in and around Plaintiff's Wells; (3) failed to recall and/or warn the users of AFFF and Non-Stick Products, negligently designed products containing or degrading into PFOA and/or PFOS, of the dangers of groundwater contamination as a result of standard use and disposal of these products; and, (4) further failed and refused to issue the appropriate warnings and/or recalls to the users of AFFF and/or Non-Stick Products containing PFOA and/or PFOS regarding the proper use and

disposal of products, notwithstanding the fact that Defendants knew the identity of the purchasers of the PFOA/PFOS Contaminants.

38. As a direct result of Defendants' acts alleged in this Complaint, Plaintiff's Wells have been contaminated and will continue to be contaminated with PFOA and/or PFOS, creating a public health hazard, unless such contamination is abated and remediated. As a direct and proximate result, Plaintiff must assess, evaluate, investigate, monitor, remove, clean up, correct, and abate PFOA and/or PFOS contamination in its Wells at significant expenses, loss and damage.

39. Defendants had a duty and breached their duty to evaluate and test such products adequately and thoroughly to determine their environmental fate and transport characteristics and potential human health and environmental impacts before they products and sold such products. They also had a duty and breached their duty to minimize the environmental harm caused by PFOA and/or PFOS.

40. Defendants, by agreement and/or tacit understanding among them, each knowingly pursued or took an active part in a common plan, design and/or conspiracy to market and/or promote products they knew to be dangerous to the environment. In particular, these Defendants engaged in joint activity for the specific purpose of suppressing, concealing, and/or minimizing information regarding the environmental risks of PFOA/PFOS and/or misleading regulators and the public about those risks.

## THE IMPACT OF PFOA AND PFOS ON PLAINTIFF'S WELLS

41. PFOA and PFOS have been detected in varying amounts at varying times in water extracted from Plaintiff's Wells. PFOA and PFOS have been detected and/or are present in certain of Plaintiff's Wells at levels above the federally advised MCL for PFOA and

PFOS. The detection and/or presence of PFOA and PFOS, and the threat of further

detection and/or presence of PFOA and PFOS, in Plaintiff's Wells in varying amounts

and at varying times has resulted, and will continue to result, in significant injuries and

damages to Plaintiff.

42.    The injuries to Plaintiff caused by Defendants' conduct constitute an unreasonable

interference with, and damage to, the limited subterranean supplies of fresh drinking

water on which Plaintiff's Wells depend. Plaintiff's interests in protecting the quality of

its citizens' limited drinking water supplies constitutes a reason for seeking damages

sufficient to restore such drinking water supplies to their pre-contamination condition.

## FIRST CAUSE OF ACTION
### Strict Liability – Design Defect and/or Defective Product

43.    Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

44.    Defendants designed, manufactured, formulated, packaged, distributed, promoted,

marketed, and/or sold products containing PFOA/PFOS Contaminants.

45.    Defendants represented, asserted, claimed and warranted that AFFF and/or Non-Stick

Products could be used in conformity with accompanying instructions and labels in a

manner that would not cause injury or damage.

46.    As manufacturers, designers, refiners, formulators, distributors, suppliers, sellers and

marketers of PFOA/PFOS Contaminants, Defendants owed a duty to all persons whom

Defendants' products might foreseeably harm, including Plaintiff, not to market any

product which is unreasonably dangerous for its intended and foreseeable uses.

47.    The PFOA/PFOS Contaminants purchased and used in the vicinity of Plaintiff's Wells

were used in a reasonably foreseeable manner and without substantial change in the

condition of such products.

48. Defendants knew, or should have known, that use of AFFF and/or Non-Stick Products in their intended manner would result in the spillage, discharge, disposal or release of PFOA and/or PFOS into or onto land.

49. The PFOA/PFOS Contaminants products used in the vicinity of Plaintiff's Wells were defective in design and unreasonably dangerous products because, among other things: (a) PFOA and PFOS cause extensive groundwater contamination, even when used in their foreseeable and intended manner; (b) even at extremely low levels, PFOA and/or PFOS render drinking water unfit for consumption; (c) PFOA and/or PFOS pose significant threats to public health; and, (d) PFOA and/or PFOS create real and potential environmental damage.

## SECOND CAUSE OF ACTION
### Strict Liability -- Failure to Warn

50. Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

51. As manufacturers, distributors, suppliers, sellers and marketers of PFOA/PFOS Contaminants, Defendants had a duty to issue warnings to Plaintiff, the public, water providers, and public officials of the risk posed by PFOA and/or PFOS.

52. Defendants knew that PFOA/PFOS Contaminants would be purchased transported, stored, handled, and used without notice of the hazards which PFOA/PFOS pose to groundwater and wells.

53. Defendants breached their duty to warn by unreasonably failing to provide warnings about potential and/or actual contamination of water resources by PFOA and/or PFOS to Plaintiff, public officials, Downstream Handlers, water providers, and/or the general

public, despite the fact that Defendants knew that these contaminants were in the drinking water. *See* Exhibit A, attached.

54.    The PFOA/PFOS Contaminants purchased or otherwise acquired from Defendants were used, discharged, and/or disposed of in or otherwise released into or onto lands in the vicinity of Plaintiff's Wells.

55.    The PFOA/PFOS Contaminants were used in a reasonably foreseeable manner and without substantial change in the condition of the products.

56.    The PFOA/PFOS Contaminants used in the vicinity of Plaintiff's Wells were defective in design and unreasonably dangerous products for the reasons set forth above.

57.    Despite the known and/or foreseeable environmental and human health hazards associated with the use and/or disposal of PFOA/PFOS Contaminants in the vicinity of subterranean drinking water supplies, including contamination of public drinking water supplies with PFOA and/or PFOS, Defendants failed to provide adequate warnings of, or take any other precautionary measures to mitigate those hazards.

58.    In particular, Defendants failed to describe such hazards or provide any precautionary statements regarding such hazards in the labeling of their PFOA/PFOS Contaminants or otherwise.

59.    As a direct and proximate result of Defendants' above-described failure to give warnings, PFOA and PFOS at all times relevant to this litigation have:

   a.    posed and continue to pose a threat to groundwater and Plaintiff's Wells;

   b.    required and/or will require additional testing and monitoring of the groundwater and production wells for PFOA and/or PFOS contamination;

   c.    contaminated, continue to contaminate, and/or will contaminate groundwater in the vicinity of Plaintiff's Wells; .

d.   raised the need to develop a comprehensive vulnerability study for Plaintiff's Wells; and,

e.   will require remediation of PFOA/PFOS groundwater contamination or, where remediation is impracticable, installation of a system to filter out PFOA/PFOS or procurement of water from alternative sources.

## THIRD CAUSE OF ACTION
### Public Nuisance

60.   Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

61.   Defendants have manufactured, distributed, marketed and/or promoted their products in a manner that created or participated in creating a public nuisance that unreasonably endangers or injures the property, health, safety and comfort of the general public and Plaintiff, causing inconvenience and annoyance.

62.   Defendants, by their negligent, reckless and willful acts and omissions set forth above have, among other things, knowingly unleashed massive, long-lasting and still spreading contamination of groundwater and drinking water wells, having concealed the threat from all, thereby causing PFOA and/or PFOS contamination of groundwater and contamination and threat of contamination of Plaintiff's Wells.

63.   Actual and threatened PFOA and/or PFOS contamination caused by Defendants' conduct has caused and continues to cause injury to Plaintiff in the form of present serious interference with the use, benefit and/or enjoyment of its property in a way that an ordinary, reasonable person would find is a substantial inconvenience and annoyance.

64.   Defendants' conduct has also injured and continues to injure the property, health, safety and/or comfort of a considerable number of persons, including a considerable number of persons in Escambia County, Florida.

65.    PFOA and PFOS contamination, both real and immediate, constitute current existing as well as prospective public nuisances.

66.    Defendants knew or in the exercise of reasonable care should have known that the introduction and use of PFOA and/or PFOS into the environment would and have unreasonably and seriously endangered, injured and interfered with the ordinary comfort, use and enjoyment of vital groundwater resources relied upon by Plaintiff.

## FOURTH CAUSE OF ACTION
### Private Nuisance

67.    Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

68.    The groundwater system, including the zone of influence in the groundwater that supplies Plaintiff's Wells, has been contaminated by PFOA and/or PFOS as a direct and proximate result of the intentional and unreasonable, negligent and reckless conduct of Defendants.

69.    PFOA and/or PFOS contamination caused by Defendants' conduct has damaged Plaintiff's property and business and unreasonably interfered with the use, benefit and enjoyment of Plaintiff's property.

## FIFTH CAUSE OF ACTION
### Trespass

70.    Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

71.    Plaintiff is the owner and/or actual possessor of property, easements, wells, the right to appropriate and use groundwater, and water rights. Defendants, their agents and employees, knew, or in the exercise of reasonable care should have known, that PFOA and/or PFOS are extremely hazardous to groundwater and public water systems, including the property and other rights of Plaintiff.

72. Defendants so negligently, recklessly and/or intentionally failed to properly control, apply, use and/or dispose of PFOA/PFOS Contaminants, such that they proximately caused and continue to cause PFOA and/or PFOS to contaminate Plaintiff's water system and the groundwater system and zone of influence of the area that supplies Plaintiff's Wells.

73. The contamination of Plaintiff's Wells has varied over time and has not yet ceased. PFOA and/or PFOS continue to migrate into and enter Plaintiff's Wells. The contamination is reasonably abatable.

74. Plaintiff has not consented to, and does not consent to, this contamination. Defendants knew or reasonably should have known that Plaintiff would not consent to this trespass.

75. As a direct and proximate result of the trespass, Plaintiff has been damaged and is entitled to injunctive relief to abate the trespass and other damages including, but not limited to, diminution in property value, loss of use and enjoyment, cost of bringing the property to its original condition, investigation, remediation, treatment, and/or to such other appropriate relief Plaintiff may elect at trial.

## SIXTH CAUSE OF ACTION
### Negligence

76. Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

77. As manufacturers, refiners, formulators, distributors, suppliers, sellers, marketers, shippers and handlers of PFOA/PFOS Contaminants, Defendants owed a duty to Plaintiff as well as to all persons whom Defendants' products might foreseeably harm to exercise due care in the handling, control, disposal, sale, testing, labeling, use, warning, and instructing for use of PFOA/PFOS Contaminants.

78.   Despite the fact that Defendants knew that PFOA and PFOS are toxic, can contaminate

water resources, and are possible carcinogens, Defendants negligently:

    a.    designed, manufactured, formulated, handled, labeled, instructed, controlled,
marketed, promoted, and/or sold PFOA/PFOS Contaminants;

    b.    issued instructions on how AFFF and Non-Stick Products should be used and
disposed of, thus improperly permitting PFOA and/or PFOS to contaminate the
groundwater in and around Plaintiff's Wells;

    c.    failed to recall and/or warn the users of AFFF and Non-Stick Products of the
dangers of groundwater contamination as a result of standard use and disposal of
this product; and,

    d.    failed and refused to issue the appropriate warnings and/or recalls to the users of
AFFF and Non-Stick Products containing PFOA and/or PFOS regarding the
proper use and disposal of products containing this toxic chemical,
notwithstanding the fact that Defendants know the identity of the purchasers of
the AFFF and Non-Stick Products.

79.   As a direct and proximate result of Defendants' acts and omissions, Plaintiff's Wells and

the groundwater that supply them have been, and continue to be, contaminated with

PFOA and/or PFOS, causing Plaintiff significant injury and damage.  As a direct and

proximate result of Defendants' acts and omissions, Plaintiff has incurred, is incurring,

and will continue to incur damages, including investigation, treatment, remediation and

monitoring costs and expenses related to the PFOA and/or PFOS contamination of its

Wells.

## SEVENTH CAUSE OF ACTION
### Negligence *Per se*

80.   Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

81.   Plaintiff alleges that Defendants negligently, carelessly, and recklessly designed,

manufactured, formulated, handled, labeled, instructed, controlled and/or sold

PFOA/PFOS Contaminants and/or negligently, carelessly and recklessly recommended

application and disposal techniques for products containing PFOA and/or PFOS that they

directly and proximately caused contamination of Plaintiff's Wells, and the groundwaters

supplying such wells, in violation of Florida Statute section 403.161(1) (public health),

which sets a standard of care or conduct to protect Plaintiff and all persons or property

within its jurisdiction, as well as the environment, from the type of improper activities

engaged in by Defendants.

## DAMAGES

82.    Plaintiff realleges and reaffirms all allegations set forth in the preceding paragraphs.

83.    As a direct and proximate result of Defendants' acts and omissions, Plaintiff is entitled to

recover damages as follows:

a.    costs and expenses related to investigation of the PFOA and/or PFOS
       contamination;

b.    costs and expenses related to treatment and remediation of PFOA and/or PFOS
       contamination of its wells; and,

c.    costs and expenses related to installation and maintenance of monitoring
       mechanisms to assess and evaluate PFOA and/or PFOS now and in the future.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests a jury trial, and upon a favorable verdict,

this Court enter a judgment against these Defendants for:

(i)     injunctive and equitable relief;

(ii)    an award of compensatory damages according to proof; and,

(iii)   such other relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury.

DATED: _July 8,_____, 2009

James M. Corrigan (FL Bar No. 161252)
James Martin Corrigan, P.A.
700 South Palafox Street, Suite 220
Pensacola, Florida 32502
Telephone: (850) 434-9999
Fax: (850) 438-8979

Scott Summy (Texas Bar No. 19507500)
Baron & Budd, P.C.
3102 Oak Lawn Avenue, Suite 1100
Dallas, Texas 75219-4281
Telephone: (214) 521-3605
Fax: (214) 520-1181

**ATTORNEYS FOR PLAINTIFF**

Environmental Monitoring – Multi-City Study
Water, Sludge, Sediment, POTW Effluent and Landfill Leachate Samples

## Executive Summary
## 3M Environmental Laboratory

## June 25, 2001

### Introduction

The Multi-City study was conducted to obtain data about the presence of fluorochemicals in the environment, foods, and drinking water, in order to understand the potential sources of human and environmental exposures. The study analyzed perfluorooctane sulfonate (PFOS), perfluorooctanoate (PFOA) and perfluorooctane sulfonamide (FOSA) in a variety of media.

Results from the study appear in a number of documents. This Executive Summary presents results from the analysis of environmental samples taken at the Multi-City sites, including:

- Drinking water,
- Surface water column,
- Sediment,
- Publicly-Owned Treatment Works (POTW) sludge,
- POTW effluent, and
- Landfill leachate samples.

As originally designed by Battelle Memorial Institute, Columbus, Ohio, the Multi-City Study paired a city having manufacturing or industrial use of fluorochemical products with a city that does not. The cities were chosen in such a way that the pairs had similar populations and drinking water supplies. Supply chain cities included in the study are Mobile, Alabama; Columbus, Georgia; Decatur, Alabama; and Pensacola, Florida. The "control cities" are Cleveland, Tennessee and Port St. Lucie, Florida.

The sections below describe the cities in the study, the sample collection, and the results for PFOS, PFOA and FOSA.

**Environmental Monitoring – Multi-City Study**
**Water, Sludge, Sediment, POTW Effluent and Landfill Leachate Samples**

## A.    Locations Sampled

The paired cities and pertinent details are as follows:

**Table 1**
**Locations Sampled in Multi-City Study**

| City | Population | Drinking Water Supply | City Type | Manufacturing Type in City |
|------|-----------|----------------------|-----------|---------------------------|
| Decatur, Alabama | 49,000 | Surface water | Supply Chain | Fluorochemical manufacture known |
| Cleveland, Tennessee | 30,000 | Surface water | Control (to Decatur) | No known significant industrial use of fluorochemicals |
| Mobile, Alabama | 196,000 | Surface water | Supply Chain | Paper |
| Columbus, Georgia | 179,000 | Surface water | Supply Chain* | Nonwovens, household additives, apparel, carpet, home textiles |
| Pensacola, Florida | 58,000 | Ground water | Supply Chain | Carpet |
| Port St. Lucie, Florida | 56,000 | Ground water | Control (to Pensacola) | No known significant industrial use of fluorochemicals |

*After the samples were collected and analyzed, it was discovered that Columbus should not be considered a "control" city, as several users of 3M fluorochemical products ("Supply Chain" facilities) were identified within the immediate vicinity. Also note that a report entitled Environmental Monitoring: Surface Water Multi-City Study provided to the U.S. EPA in the August 2000 submission incorrectly stated that five of the six cities fall into the category of supply locations. There are actually four of the six cities in the study that are supply chain cities.

## B.    Sampling Information

This Executive Summary should be read in conjunction with the detailed reports, which include sampling location maps of the six cities, field sampling reports, a field audit report, the quality assurance project plan, study-specific Standard Operating Procedures (SOPs), a document outlining the original design and structure of the study, a draft drinking water health advisory for PFOS, and multiple final analytical reports. Many of these documents have been submitted previously, but are also included here so the materials can be found together.

This Executive Summary describes results for samples taken from the following sources and media in each of the six cities:

2

### Environmental Monitoring – Multi-City Study
#### Water, Sludge, Sediment, POTW Effluent and Landfill Leachate Samples

1. Final effluent from a Publicly Owned Treatment Works (POTW) domestic wastewater treatment plant serving the city.

2. Biological solids (sludge) from the same POTW as the effluent.

3. Raw water input to the city drinking water treatment plant (sampling point within the plant itself).

4. Treated drinking water, collected within the city drinking water plant itself before release to the distribution system.

5. Tap drinking water from three separate retail locations within the city.

6. Leachate from a municipal landfill that serves the city.

7. Surface water. For cities in which drinking water is derived from surface water, samples were taken from the water body that serves as the source of raw water input into the city drinking water treatment plant. Where groundwater is the drinking water source, a surface water body was substituted for the groundwater samples. Surface water was sampled in three locations per city, at sites at least 500 feet apart.

8. Sediment samples taken at the same sites as the surface water.

9. A quiet water, such as a pond, where there is no obvious flow.

As is always the case with field work, deviations from the original sampling plan occurred as the study progressed, and the design of the study evolved. Some samples were not analyzed or collected as originally planned:

 a. Alcohols and various intermediate metabolites were not found in preliminary biosphere samples, and the target analytes for the study were therefore narrowed to PFOS, PFOA, and FOSA.

 b. The 3M Environmental Laboratory Field Sampling Team identified errors in the air sampling procedure utilized. Air samples therefore were not analyzed.

 c. Electro-fishing for finfish was conducted; however, the catch was too limited for analysis.

 d. Surface microlayer samples were collected. However, an accepted method for sample handling and the evaluation and interpretation of data was not available. Samples therefore were not analyzed.

3

## Environmental Monitoring – Multi-City Study
### Water, Sludge, Sediment, POTW Effluent and Landfill Leachate Samples

e.  Landfill leachate and quiet surface water samples could not be collected in Cleveland, TN, as the sampling team was not given permission to sample by local authorities or property owners.

f.  In Mobile, AL and Pensacola, FL, the landfill leachate could not be collected at the landfill facility. Samples were instead collected from creeks, which appeared to be flowing from the direction of the landfill site. However, this likely is not representative of leachate.

g.  The samplers could not get access to post-chlorination POTW influent samples at any site. Samples of POTW influent were not collected at any city due to health concerns for the sampling personnel.

h.  The quiet water site in Port St. Lucie was sampled two additional times in an attempt to verify PFOS concentrations that were higher than in any other surface water site.

Appendix I contains selected observations made by field sampling personnel during sample collection. Actual field notes are contained in the separate documentation.

Environmental Monitoring – Multi-City Study
Water, Sludge, Sediment, POTW Effluent and Landfill Leachate Samples

Decatur POTW for treatment. All surface water sample points and the drinking water plant intake are located upstream of the 3M Decatur fluorochemical manufacturing facility.

PFOS was detected at measurable concentrations in all of the POTW sludge samples collected, except for the first Port St. Lucie sampling. Concentrations (based on dry weight of sludge) in Cleveland, Columbus, and Pensacola sludge ranged from 116 to 159 µg/kg (ppb). In Port St. Lucie (second sampling) and Mobile, it was detected at 58 – 63 µg/kg (dry weight). A recent study (3M Environmental Laboratory, 2001, submitted to EPA June 29, 2001) of PFOS sorption/desorption utilizing soil, sediment and sludge samples concluded that:

> Perfluorooctane sulfonate (PFOS) strongly adsorbs to all of the soil/sediment/sludge matrices tested. The test substance, once adsorbed, does not desorb readily, even when extracted with an organic solvent.

In the above study, PFOS sorbed to sludge very strongly (> 96% sorbed) within the first few hours of exposure. The $K_d$ values obtained for sediment and sludge were 7.42 mL/g and 120 mL/g, respectively. Because PFOS is a strong acid, it forms strong bonds with sludge and sediment via the mechanism of chemisorption. Thus, the POTW sludge results most likely are attributable to the fact that PFOS strongly sorbs to sludge.

Sediment concentrations were much lower than those seen in POTW sludge. The measured sediment values in Columbus, Mobile, Pensacola and Port St. Lucie were often just above the limit of quantitation (LOQ). (The LOQ varied with the percent solids in the sample, and was approximately 0.2– 0.4 µg/kg or ppb on a dry weight basis.) The sorptive characteristic of PFOS may also explain the concentrations seen in sediments at Columbus, Mobile, and Pensacola. The source of PFOS in the sediments in Port St. Lucie is probably not the POTW effluent, as that effluent is injected into the ground, not discharged into the river.

PFOS was detected at very low levels (<0.14 µg/L) in some surface waters. In Pensacola, Port St. Lucie and Mobile, it was detected in 1 or 2 of the three sites sampled. In Columbus, PFOS was detected consistently across all surface water, drinking water influent, treated drinking water, and tap water samples, at relatively similar concentrations (0.053 – 0.083 ppb). This is not surprising, as the surface water samples and drinking water intake samples were taken in the same vicinity. PFOS was detected in tap water at one site in Pensacola, where replicate samples had 0.042 and 0.047 µg/L. Samples from the other two tap water sites in Pensacola, as well as the drinking water intake and output, did not have detectable concentrations of PFOS. In order to provide perspective in interpreting the findings in drinking water, 3M's July 1999 calculation of a draft Drinking Water Advisory Level for PFOS is included in this submission. Using EPA methodology, 3M calculated a PFOS drinking water advisory level of 1 µg/L (ppb). All of the findings in drinking water were substantially below this level.

PFOS was initially detected at relatively higher concentrations than seen elsewhere in the quiet water site in Port St. Lucie. Further investigation of the quiet water site was undertaken

6

**Environmental Monitoring – Multi-City Study**
**Water, Sludge, Sediment, POTW Effluent and Landfill Leachate Samples**

to verify the results and to try to identify a source of PFOS. The quiet water site, a small water pond, was sampled two more times after the initial results were obtained. The samples collected in the third sampling event were split and analyzed at two different laboratories; the third round of sampling included the original quiet water site, two additional quiet water sites, and sediments associated with each of the three sampling sites. The data for PFOS is presented below:

**Table 3**
**Port St. Lucie Quiet Water**
**PFOS Concentration, Parts per Billion**

| Sample Description | First Sample 7/29/99 | Second Sample 7/18-19/00 | Third Sample 1/24/01 3M Env. Lab Results | Third Sample 1/24/01 Centre Results* | Corresponding Third Sample Sediments (dry weight) |
|---|---|---|---|---|---|
| Site I | 45.3 51.1 | 2.93 2.85 | | | |
| East | not sampled | not sampled | 1.60 | (1.97, 2.22, 2.31) | (9.64, 9.34) |
| South | not sampled | not sampled | 1.54 | (2.12, 2.09) | (12.0, 14.3) |
| West | not sampled | not sampled | 1.59 | (2.20, 2.34) | (10.8, 10.5) |
| North | not sampled | not sampled | 1.78 | (2.08, 2.01, 2.37, 2.23) | (9.28, 9.50, 8.29, 8.37) |
| Site I Culvert Discharge | not sampled | not sampled | 1.36 | 1.84 1.96 | not sampled |
| Additional Quiet Water Site 2 | not sampled | not sampled | NQ 0.015 | NQ NQ 0.025 | NQ |
| Additional Quiet Water Site 3 | not sampled | not sampled | NQ | 0.026 NQ | NQ |

*Several samples taken. Where 4 values in a row, includes sample, lab dup., blind dup. and lab blind dup.; 3 values in a row are sample, lab dup and field dup. Where only 2 values, are sample and lab dup.
LOD (Limit of Detection) approximately 0.0025 µg/L for water and 0.060 µg/kg for sludge and sediment as received (wet weight)
LOQ (Limit of Quantitation) is 0.025 µg/L for surface water at Centre, 0.010 µg/L at 3M Env. Lab and 0.2 µg/kg for sludge and sediment as received (wet weight)
NQ = compound detected at a level between the LOD and LOQ

Despite diligent investigation, 3M has been unable to confirm the initial sampling results, nor to identify any potential source of the initial readings. Samples of the same quiet water collected in 2000 and 2001 contained markedly lower levels of PFOS. In addition, the samples from the other two quiet water ponds in Port St. Lucie had either no detectable or quantifiable levels of PFOS, or very low levels similar to those seen in water column samples from other cities. Moreover, a culvert draining into the pond used for the initial quiet water sampling was sampled in the third round of sampling and found to contain concentrations similar to those in the more recent sampling of the pond itself. Finally, the sediment sampling results are more consistent with the subsequent sampling results. Thus, the initial quiet water results in Port St. Lucie appear to be an anomaly.

7

## Environmental Monitoring – Multi-City Study
### Water, Sludge, Sediment, POTW Effluent and Landfill Leachate Samples

### Results: PFOA

#### Table 4
#### PFOA Concentration, Parts per Billion

Results of Duplicate Samples

| Sample | Decatur | Cleveland | Mobile | Columbus | Pensacola | Port St. Lucie* | Port St. Lucie** |
|---|---|---|---|---|---|---|---|
| POTW effluent | 2.14 | 0.656 | 0.067 | 0.136 | 0.084 | 0.041 | 0.043 |
| | 2.42 | 0.674 | 0.088 | 0.147 | 0.090 | 0.044 | 0.040 |
| POTW sludge | 101 | 3.11 | | 18.5 | 2.51 | NQ | ND |
| (dry wt) | 244 | 2.82 | NQ | 18.3 | 2.40 | NQ | ND |
| Drinking water influent | ND | ND | ND | 0.026 NQ | ND | ND | ND |
| Drinking water treated | ND | ND | ND | 0.025 0.029 | ND | ND | ND |
| Drinking water tap 1 | ND | ND | ND | 0.026 NQ | ND | ND | ND |
| Drinking water tap 2 | not analyzed | ND | ND | 0.026 NQ | ND | ND | ND |
| Drinking water tap 3 | not analyzed | ND | ND | 0.025 NQ | ND | ND | ND |
| Landfill leachate | 48.1 | | | NQ | | 0.963 | 1.03 |
| | 46.8 | not collected | ND | 0.026 | ND | 0.939 | 1.02 |
| Surface water 1 | NQ | NQ | 0.026 | 0.026 | | | |
| | ND | ND | 0.027 | 0.026 | ND | ND | ND |
| Surface water 2 | ND | | 0.054 | 0.026 | | | |
| | NQ | ND | 0.060 | 0.027 | ND | NQ | ND |
| Surface water 3 | | | 0.063 | | | | |
| | ND | ND | 0.083 | NQ | ND | ND | ND |
| Sediment 1 | ND | | | | | 0.370 | |
| (dry wt) | NQ | ND | NQ | ND | ND | 0.328 | ND |
| Sediment 2 | | | | | NQ | 0.318 | |
| (dry wt) | NQ | NQ | ND | ND | ND | 0.264 | ND |
| Sediment 3 | | | | | | 1.68 | |
| (dry wt) | NQ | ND | NQ | ND | ND | 1.75 | ND |
| Quiet water | 0.057 | | NQ | | | 0.737 | 0.097 |
| | 0.063 | not collected | 0.027 | ND | ND. | 0.766 | 0.097 |

*Data from 1999 sample event
**Data from 2000 sample event. Additional samples in 2001 (not shown) showed similar results.
LOD (Limit of Detection) approximately 0.0075 µg/L for water and 0. 60 µg/kg for sludge and sediment as received (wet weight)
LOQ (Limit of Quantitation) is 0.025 µg/L for water, 0.2 µg/kg for sludge and sediment as received (wet weight).
ND = not detected
NQ = compound detected at a level between the LOD and LOQ

PFOA was found in similar samples in the same cities as PFOS. The concentrations of PFOA were generally lower than those of PFOS, although in some cases the concentrations were similar.

**Environmental Monitoring – Multi-City Study**
**Water, Sludge, Sediment, POTW Effluent and Landfill Leachate Samples**

## Results: FOSA

### Table 5
### FOSA Concentration, Parts per Billion

Results of Duplicate Samples

| Sample | Decatur | Cleveland | Mobile | Columbus | Pensacola | Port St. Lucie* | Port St. Lucie** |
|---|---|---|---|---|---|---|---|
| POTW effluent | 0.056 0.056 | NQ | NQ | 0.065 0.065 | NQ | NQ | NQ |
| POTW sludge (dry wt) | 107.0 97.8 | 1.88 1.70 | NQ | 41.3 43.4 | 1.27 1.29 | NQ | ND |
| Drinking water influent | ND | ND | ND | NQ | ND | ND | ND |
| Drinking water treated | ND | ND | ND | NQ | ND | ND | ND |
| Drinking water tap 1 | ND | ND | ND | NQ | ND | ND | ND |
| Drinking water tap 2 | not analyzed | ND | ND | NQ | ND | ND | ND |
| Drinking water tap 3 | not analyzed | ND | ND | NQ | ND | ND | ND |
| Landfill leachate | 0.256 0.249 | not collected | ND | ND | ND | NQ | NQ |
| Surface water 1 | ND | NQ ND | NQ | NQ | ND | ND | ND |
| Surface water 2 | ND | ND | NQ | NQ | ND | ND | ND |
| Surface water 3 | ND | ND | NQ | NQ | ND | ND | ND |
| Sediment 1 (dry wt) | ND NQ | ND | NQ | NQ | ND | NQ | ND |
| Sediment 2 (dry wt) | NQ | NQ | 0.383 0.343 | NQ | ND | NQ | ND |
| Sediment 3 (dry wt) | NQ | ND | 0.838 0.516 | NQ | ND | NQ | ND |
| Quiet water | NQ | not collected | NQ | ND | ND | 0.084 0.095 | 0.030 0.026 |

*Data from 1999 sample event
**Data from 2000 sample event. Additional samples in 2001 (not shown) showed similar results.
LOD (Limit of Detection) approximately 0.0025 µg/L for water and 0.060 µg/kg for sludge and sediment as received (wet weight)
LOQ (Limit of Quantitation) is 0.025 µg/L for water, 0.2 µg/kg for sludge and sediment as received (wet weight)
ND = not detected
NQ = compound detected at a level between the LOD and LOQ

FOSA was detected at low levels in a few locations. The highest concentrations were seen in Decatur POTW sludge and landfill leachate, with somewhat similar results in Columbus.

## Conclusions

Of the three fluorochemicals studied in environmental samples from the six cities, PFOS is found most often, followed by PFOA, then FOSA, all in very low concentrations. The two cities that were intended to be "control" cities (Cleveland and Port St. Lucie) did, in some cases, have much lower concentrations of these analytes than the supply chain cities. However, there was not a consistently higher concentration of the target analytes in all

9

**Environmental Monitoring – Multi-City Study**
**Water, Sludge, Sediment, POTW Effluent and Landfill Leachate Samples**

sample matrices from all supply chain cities. Mobile, a supply chain city, generally had lower concentrations of fluorochemicals than the other supply chain cities.

Most fluorochemicals measured were associated with wastewater treatment/sediment samples; very little to none were found in surface waters and drinking water. All detected concentrations of PFOS in drinking water were well below 3M's 1999 calculated draft Drinking Water Health Advisory (DWHA) of 1 ppb lifetime exposure for PFOS. In all surface water sites sampled, the concentrations of PFOS, PFOA and FOSA were below laboratory-derived no-observed-effect concentrations for aquatic organisms (see various aquatic studies submitted to EPA).

In light of these results, further sampling in additional cities is not likely to materially improve our understanding of the presence and extent of PFOS, PFOA and FOSA in the environment. Accordingly, initial plans for sampling in six further cities were not pursued.

ironmental Monitoring – Multi-City Study
Water, Sludge, Sediment, POTW Effluent and Landfill Leachate Samples

## Appendix I

### FIELD SAMPLING COMMENTS

Decatur:
1. Surface water samples were collected in an area of a highly active marina complex.
2. Landfill leachate samples were collected from a recently constructed collection pond, which contained a variety of wildlife living in and around it.
3. Sediments and surface water were obtained upstream from the POTW.

Cleveland:
1. The drinking water plant intake is approximately 2 miles east/northeast of the

    plant.
2. Sediments and surface water were obtained upstream from the POTW.

Mobile:
1. Landfill leachate was not collected; an alternative sample was taken from a creek located downslope from the landfill.
2. The POTW is adjacent to a coal depot in a highly industrialized area.
3. The spring-fed reservoir used as the drinking water source was not sampled. The sampling crew erroneously assumed that the Mobile River, which is brackish and tidally influenced, was the drinking water intake, and took samples there.
4. The water treatment plant sampled is the smaller of the two the city maintains.
5. Sediments and surface water were obtained from a region upstream of the POTW.

Columbus:
1. The POTW diffuses its discharge 100 feet from shore.
2. POTW sludge is dried and land-applied.
3. Sediments and surface water were obtained from a region in the vicinity of or just downstream of the POTW.

Pensacola:
1. Landfill leachate was not collected; an alternative sample was taken from a creek located close to the landfill.
2. Sediments and surface water were obtained from a bayou upstream of the POTW. Since Pensacola uses groundwater, the Texar Bayou was sampled as the surface water and sediment site. This bayou contains brackish water and is tidally influenced. A local newspaper described Texar Bayou as heavily contaminated with heavy metals from two industrial sites and high levels of fecal coliform. Some city wells are contaminated with volatile organics, and fitted with charcoal filters. The well sampled was not filtered.
3. POTW sludge is incinerated onsite.

11

**Environmental Monitoring – Multi-City Study**
**Water, Sludge, Sediment, POTW Effluent and Landfill Leachate Samples**

Port St. Lucie:
### 1999 Sampling
1. Surface water was taken from brackish, tidally-influenced waters. Sediments and surface water were obtained from a region approximately 10 miles north of the POTW.
2. Drinking water is ground water; surface water does not relate directly to drinking water.
3. Sludge sample was taken after the chlorine contact chamber (pre-treated).
4. The POTW effluent is injected into the ground, not discharged to a river.

### First resampling (2000)

1. POTW samples were collected at two points – at the injection well, and at the chlorine contact chamber (chlorination was not occurring at the time of sampling). The samples from the chlorine contact chamber are representative of the samples collected in 1999.
2. The quiet surface water pond was approximately 200 feet by 200 feet. The water was noted to be fairly clear with some minnows present. Styrofoam, plastic, bags, a can and a bottle were some of the litter noted in the water. Sampling was conducted approximately 45 feet away from visible litter.

### Second resampling (2001)
1. In quiet water site I, the water was noted to be fairly clear with some minnows present. A large fish, estimated to be 10 pounds, was noted in the pond. Styrofoam, plastic bags, cans and bottles were some of the litter noted in the water. A greenish film was also noted on the water surface. Sediment samples were sandy with some clams present.
2. In quiet water site I, a culvert was noted running into the pond. The influent created a tan to gray plume as it entered the pond. The samplers were informed that it had rained approximately ½ an inch two days prior to sampling.

12

**IN THE CIRCUIT COURT, IN AND FOR ESCAMBIA COUNTY FLORIDA**
CLERK OF CIRCUIT COURT, FL
ESCAMBIA COUNTY, FL

EMERALD COAST UTILITIES AUTHORITY,

2009 AUG 13  P 3: 04

    Plaintiff,

DIVISION
CIRCUIT CLERK FILED
v.             FILE CASE NO: 2009 CA 002177
DIVISION B

3M COMPANY; E.I. DUPONT DE
NEMOURS AND COMPANY;
SOLUTIA, INC.; and FIRE RAM
INTERNATIONAL, INC.,

    Defendants.
_____/

## UNOPPOSED MOTION FOR EXTENSION OF TIME TO ANSWER COMPLAINT

Undersigned counsel for Defendant, 3M COMPANY, respectfully requests the Court to

grant an extension of time to file an Answer or other Response to the Complaint herein, and as

good cause therefore would show that the allegations in the Complaint involve a product 3M

Company has not sold since 2002. The matters alleged involve numerous concerns of a technical

nature involving substantial review and research of the company's records. Analysis of the

allegations of the Complaint and other facts is necessary before an adequate Answer or other

Response may be made. Counsel for 3M Company conferred on August 11, 2009 with counsel

for Plaintiff, James Corrigan, Esq. and can represent that Plaintiff does not oppose the relief.

WHEREFORE, Defendant, 3M COMPANY, respectfully requests the Court to grant an

additional fifteen (15) days of time or through and including August 28, 2009, in which to

respond to the Complaint.

Respectfully submitted,

**T. LARRY HILL**

Florida Bar No. 173908
**CHARLES F. BEALL, JR.**
Florida Bar No. 66494
**GEORGE R. MEAD, II**
Florida Bar No. 096490
MOORE, HILL & WESTMORELAND, P.A.
220 W. Garden Street, 9th Floor
Pensacola, Florida 32501
Tel: 850/434-3541
Fax: 850/435-7899
Counsel for Defendant, 3M Company

Of Counsel

Harlan I. Prater IV
William H. Brooks
LIGHTFOOT, FRANKLIN & WHITE, L.L.C.
400 North 20th Street
Birmingham, Alabama 35203-3200
(205) 581-0700

Katherine L. Rhyne
Cynthia M. Stroman
King & Spalding LLP
1700 Pennsylvania Avenue NW
Washington. D.C. 20006-4706
(202) 626-3743

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing has been furnished by

U.S. Mail, postage prepaid, to James M. Corrigan, James Martin Corrigan, P.A., 700 South

Palafox Street, Suite 220, Pensacola, Florida 32502 and Scott Summy, Baron & Budd, P.C.,

3102 Oak Lawn Avenue, Suite 1100, Dallas, Texas 75219-4281 on this 13th day of August,

2009.

GEORGE R. MEAD, II

# Exhibit B

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

**EMERALD COAST UTILITIES**
**AUTHORITY,**

**Plaintiff,**

**CASE NO.:** _____

v.

**3M COMPANY; E.I. DUPONT DE**
**NEMOURS AND COMPANY;**
**SOLUTIA, INC.; and FIRE RAM**
**INTERNATIONAL, INC.,**

**Defendants.**

## DECLARATION OF CHRISTOPHER BENSON

I, Christopher Benson, under penalty of perjury, declare as follows:

1.     My name is Christopher Benson and I am over the age of eighteen

years. I am competent and authorized to make this Declaration and the matters

contained therein are within my personal knowledge and true and correct.

2.     I am an attorney with the law firm King & Spalding LLP, located at

1700 Pennsylvania Avenue, NW, Washington, DC 20006. I have been admitted to

and am a member in good standing of the Virginia and District of Columbia bars.

3.     I have reviewed the complaint filed by the Emerald Coast Utilities

Authority ("ECUA") in Escambia County in the above-referenced matter.

4.     The complaint filed by ECUA names Fire Ram International,

Incorporated ("Fire Ram") as a defendant. The complaint, at paragraph 11(d), lists

Fire Ram's registered agent as William Q. Schilling, 222 Poinciana Drive, Sunny

Isles Beach, FL 33160-4518.

5.      In response to the complaint, I conducted research on Fire Ram, using publicly available resources, including Westlaw; Dun & Bradstreet; the Florida Department of State, Division of Corporations; Miami-Dade property and tax records; and general search engines on the world-wide web. In addition, death certificates were obtained via Vital Chek, a publically available records service that can be accessed at http://www.vitalchek.com/.

6.      According to a Dun & Bradstreet report, 100% of Fire Ram's capital stock was owned by William and Dawn Schilling. Exhibit 1 is a true and correct copy of a Dun & Bradstreet report on Fire Ram. In addition to Mr. Schilling, the report indicates that Fire Ram had a single employee, and had estimated annual sales totaling $100,000. *See* Exhibit 1 at 1, 5.

7.      Both Mr. and Mrs. Schilling are deceased. Mrs. Schilling died on March 30, 2005. Exhibit 2 is a true and correct copy of the obituaries which appeared in the South Florida Sun Sentinel on April 1, 2005, and Exhibit 3 is a true and correct copy of Mrs. Schilling's death certificate. Mr. Schilling died on May 19, 2008. Exhibit 4 is a true and correct copy of Mr. Schilling's obituary, which appeared in the Miami Herald, and Exhibit 5 is a true and correct copy of Mr. Schilling's death certificate.

8.      According to Fire Ram's articles of incorporation, which are available on the Florida Department of State, Division of Corporations website,[1] Fire Ram was incorporated in the state of Florida on December 20, 1996. Exhibit 6 is a true and correct copy of Fire Ram's articles of incorporation filed with the Florida Department of State, Division of Corporations.

---

[1] http://www.sunbiz.org/scripts/cordet.exe?action=DETFIL&inq_doc_number=P96000103759&inq_ca me_from=NAMFWD&cor_web_names_seq_number=0000&names_name_ind=N&names_cor_numbe r=&names_name_seq=&names_name_ind=&names_comp_name=FIRERAMINTERNATIONAL&na mes_filing_type=

2

9.      According to Fire Ram's annual reports filed with the Florida
Department of State, Division of Corporations, which are also available on the
Department's website, William Q. Schilling served as an officer of Fire Ram
beginning in 1997, and in January 27, 2004, became president and secretary of the
company. Exhibit 7 is a true and correct copy of Fire Ram's annual reports filed with
the Florida Department of State, Division of Corporations from 1997-2008. Mr.
Schilling served as president and secretary of Fire Ram through April 28, 2008. He
also served as the registered agent of Fire Ram from April 30, 2005 through April 28,
2008. *See* Exhibit 7.

10.     According to Fire Ram's annual reports filed with the Florida
Department of State, Dawn Schilling was the registered agent for Fire Ram from
April 26, 2000 until April 30, 2005. *See id.* Mrs. Schilling was also listed as the vice-
president and treasurer of Fire Ram from January 27, 2004 through April 30, 2005.
*See id.*

11.     According to Fire Ram's annual reports filed with the Florida
Department of State, the address for Fire Ram's registered agent has been 222
Poinciana Island Drive, Sunny Isles Beach, FL 33160 from April 26, 2000 through
April 28, 2008. *See id.* The same address was listed as the principal place of business
for Fire Ram from March 6, 2001 through April 28, 2008. *See id.* This address
appears to have been the principal residence of Mr. and Mrs. Schilling as well.
Exhibit 8 is a true and correct copy of real estate records obtained from the Miami-
Dade County website.

12.     According to the Florida Department of State, Division of
Corporations website, Fire Ram has not filed its 2009 annual report, which was due
by May 1, 2009. Exhibit 9 is a true and correct copy of records obtained from the

3

Florida Department of State, Division of Corporations website regarding Fire Ram.

Florida statutes provide that:

> The Department of State may commence a proceeding under s. 607.1421 to administratively dissolve a corporation if:
>
> (a) The corporation has failed to file its annual report and pay the annual report filing fee by 5 p.m. Eastern Time on the third Friday in September.

Fla. Stat. Ann. § 607.1420(1). Further:

> Administrative dissolution for failure to file an annual report shall occur on the fourth Friday in September of each year. The Department of State shall issue a certificate of dissolution to each dissolved corporation.

Fla. Stat. Ann. § 607.1421(1).

13. Real estate records obtained from the Miami-Dade County website indicate that the 2008 property taxes have not been paid for Mr. and Mrs. Schilling's residence at 222 Poinciana Island Drive, the address of Fire Ram's last registered agent. Exhibit 10 is a true and correct copy of real estate property tax records obtained from the Miami-Dade County website.

Dated: August 20, 2009

Christopher Benson

4