**UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF FLORIDA
PENSACOLA DIVISION**

**EMERALD COAST UTILITIES
AUTHORITY,**

      **Plaintiff,**

**v.**                                      **Case No. 3:09cv361/MCR/MD**

**3M COMPANY, E.I. DuPONT DE
NEMOURS AND COMPANY,
SOLUTIA, INC., AND FIRE RAM
INTERNATIONAL, INC.,**

      **Defendants**.

_____/

**O R D E R**

Plaintiff Emerald Coast Utilities Authority (ECUA) filed suit in Escambia County Circuit Court against Defendants 3M Company (3M), E.I. DuPont De Nemours and Company (DuPont) and Solutia, Inc. (Solutia) on July 8, 2009 (doc. 1, state court attachment), asserting the following claims: (1) Strict Liability - Design Defect and/or Defective Product; (2) Strict Liability - Failure to Warn; (3) Public Nuisance; (4) Private Nuisance; (5) Trespass; (6) Negligence; and (7) Negligence Per Se. (*See* Complaint, Doc. 1-1.)[1] ECUA seeks damages for costs and expenses relating to (1) investigation of the contaminating chemicals in its water; (2) treatment of the same chemicals; and (3) ongoing monitoring of the contaminant levels in the water; as well as injunctive relief. 3M, joined by the other defendants, removed the case to this court on August 21, 2009. (Doc. 1.)

---

[1] Plaintiff's complaint also included as a defendant Fire Ram International, Inc. (Complaint, ¶ 6.) The court has concluded that Fire Ram, an insolvent corporation, was fraudulently joined in this litigation to prevent removal.

Defendant 3M filed a Motion for Summary Judgment on January 19, 2010. (Doc. 70).  Defendants Solutia and Dupont subsequently filed similar motions (docs. 95 and 103).  The defendants have moved for summary final judgment on the grounds that (1) ECUA lacks Article III standing because it has suffered no injury-in-fact and cannot show that any injury is traceable to the defendants; (2) ECUA cannot show a legally cognizable injury in relation to its tort claims; and (3) ECUA's claims are not ripe because the contaminant levels in ECUA waters are in compliance with state and federal standards. (*See* Doc. 71.) ECUA opposed to the respective motions (docs. 105, 122 and 131).  The parties filed memoranda of law, statements of facts, and affidavits supporting their positions.[2]  The court heard oral arguments on April 29, 2010.  Based on careful consideration of the arguments presented at the hearing, each parties' respective filings, the documents and admissions on file, and the supporting affidavits, the court concludes that summary final judgment should be entered on all claims against 3M, DuPont, and Solutia because ECUA has failed to demonstrate an injury in fact for the purposes of Article III standing.[3]

## BACKGROUND

ECUA supplies drinking water to residents and businesses in Escambia County, Florida.[4]  ECUA operates 32 wells within the county that draw water from the Sand-and-Gravel Aquifer.[5]  ECUA contends that these wells are contaminated by perfluorooctanoic acid (PFOA) and perfluorooctane sulfonate (PFOS), which ECUA further contends are

---

[2]  Defendant DuPont did not separately file a statement of facts supporting its motion, noting that such a filing would be duplicative of the facts forwarded by 3M and Solutia (doc. 141).

[3]  Plaintiff suggests in its responses that summary judgment is premature at the current state of discovery.  (*See* doc. 143.)  The court disagrees and points to the Order Deferring Ruling on Motions for Protective Order (doc. 155), signed by Magistrate Judge Miles Davis, noting that deferring discovery will not prejudice the plaintiff and that "plaintiff has not pointed to any needed but withheld evidence in its responses to [the summary judgment] motions."  The court also notes that the parties stipulated that no further discovery was necessary for the summary judgment motions (doc. 158); the undersigned subsequently stayed all discovery (doc. 161).  The court further notes that plaintiff has not submitted affidavits under Fed. R. Civ. P 56(f) showing specific reasons why it "cannot present facts essential to justify its opposition."

[4]  The water supplier was established in 1981 under the laws of Florida.

[5]  A 2003 Escambia County Grand Jury Report noted that the Sand-and-Gravel Aquifer is very near the surface and thus susceptible to contamination.  (Doc. 111, at 2.)

toxic, chemical byproducts of defendants' industrial activities.

In the past, Defendant 3M produced Aqueous Film-Forming Foam ("AFFF"), a fire-retardant product used to control different types of fires, and supplied it to the military for approximately 30 years. 3M shipped AFFF to Navy facilities in Escambia County, including Pensacola Naval Air Station. The Navy patent on AFFF, under which 3M produced the product, called for the use of PFOA or PFOS during production. In 2000, 3M announced it would no longer manufacture products based on perfluorooctanyl chemistry and in 2002 it stopped selling AFFF to the Navy. ECUA contends that defendant Solutia used 3M products in Escambia County during this period and provides as evidence a Solutia company email discussing alternatives "in light of 3M's recent announcement." (Doc. 143, Exhibit F.) ECUA alleges that the Navy used AFFF in joint exercises with civilians at the Pensacola Regional Airport. ECUA also alleges that 3M negligently instructed users to dispose of AFFF by washing it into the soil and that such practices contaminated the Sand-and-Gravel Aquifer and ultimately contaminated the water in ECUA wells. ECUA further alleges that 3M negligently designed and marketed AFFF and that 3M failed to warn users about the dangers of AFFF.

DuPont nationally marketed its Teflon, and other non-stick products, primarily as a coating for household cookware. ECUA alleges that DuPont is a leading producer of products containing PFOA. DuPont released approximately 49,000 kilograms of PFOA during United States manufacturing activities in the years 2000, 2003, and 2004. In late 2005, DuPont settled with the EPA for over $10 million in response to penalties relating to DuPont's work with PFOA products. ECUA alleges that several of DuPont's products, including Teflon, Zonyl, Foraperle, and Tefzel contributed to the presence of PFOS and PFOA in ECUA wells. ECUA further alleges that DuPont marketed and/or sold products containing PFOA and PFOS in Escambia County, DuPont was aware that its chemicals degrade into the contaminants, it was aware that its products were tested at the Solutia facility in Pensacola, Florida, and it was reasonably foreseeable to DuPont that third parties

would use these chemicals in Escambia County.[6]  ECUA also alleges that DuPont failed to disclose the hazards of PFOA and PFOS.

Defendant Solutia has a manufacturing plant in Escambia County; its annual report for the year ending December 31, 1997, identified the Pensacola plant as the world's largest integrated nylon manufacturing plant.  ECUA contends that Solutia manufactured and sold a variety of non-stick products in Escambia County that degraded into PFOA or PFOS.  More specifically, ECUA identifies Solutia documents containing a description of specific chemical tests, including one containing perfluouroalcohol alkyl condensate, that were performed at its Pensacola facilities.  (Doc. 143, Exhibit E, Exhibit H.)[7]  ECUA provided the declaration of Dr. Nicholas Cheremisinoff, a chemist who states that, "within scientific certainty," the chemicals described in Solutia's testing documents "will degrade into PFOA."  (Doc. 143-12, at 7.)  ECUA also identifies documents wherein Solutia describes Pensacola waste disposal procedures through deep well injection after biodegradation.  The record demonstrates that until at least 2003, the EPA and the FDEP permitted Solutia to dispose of wastewater in this fashion.

In June 2001, 3M engaged a study (Multi-City Study) to determine the level of fluorochemicals present at various 3M locations throughout the United States and explore the exposure to humans and the environment.  Pensacola was identified as a "supply-chain" city, meaning that users of 3M fluorochemicals were in its vicinity.  (Doc. 109, Exhibit B.) With the consent of ECUA, 3M sampled untreated groundwater, treated drinking water, and tap water from three locations in Pensacola.  The study detected small amounts of PFOA and PFOS in publicly owned treatment works effluent, surface water samples, and sediment samples.  It also identified a small amount of PFOS in one of three drinking tap water samples.  There is no indication that ECUA took any action or engaged in any further testing based on the results of the Multi-City testing or ran any tests relating to PFOA or

---

[6]  Defendant DuPont does not have a manufacturing facility in Escambia County.

[7]  Some of these documents refer to Monsanto Company instead of Solutia.  Solutia was formed in 1997 out of businesses which were formerly wholly owned by Monsanto.  (*See* Doc. 143-2, 4-5.)

PFOS until 2006.

In 2006, ECUA was contacted by outside parties and informed of possible PFOA and PFOS exposure in Escambia County wells. In response, ECUA commissioned a study by Camp, Dresser, & McKee, Inc. (CDM) to test several wells: Airport North, McAllister, Hagler, and Bronson Field, as well as the Summit Boulevard Blending Point Station. CDM took water samples in November 2006 and published test results in a report in January 2007. The report noted that there was not a maximum contaminant level (MCL) for PFOA or PFOS based on EPA guidelines.[8] CDM relayed, however, that the EPA had published information in a consent order establishing an action level for PFOA at 0.50 parts per billion (ppb). The report further noted that CDM could uncover no information indicating that the EPA had considered PFOS. CDM sent samples to two separate laboratories and published the results from both labs. PFOA and PFOS were found in every sample, including both raw and treated water.[9] The highest reported level was at the McCallister well, where one lab reported 0.12 ppb in untreated water. CDM notes that the highest reported level of PFOA was significantly below the level in the EPA consent order, and that "the PFOA and PFOS values found in the water samples should not be a cause of concern given EPA's apparent direction thus far." (Doc. 73, Exhibit E, Attachment A.) The report further pointed to the results at the McAllister well, where raw water reported the highest levels of PFOS and PFOA, but treated water showed the chemicals "well below laboratory direction limits." (Doc. 73, Exhibit E, Attachment A.) CDM identified the well's granular activated carbon (GAC) pressure vessels for the success of the filtration. CDM concluded that "[f]rom the chemical analysis performed, EPA's current position, and the apparent ability to remove PFOA and PFOS with GAC treatment, there does not appear to be a

---

[8] An MCL is an enforceable contaminant concentration threshold for drinking water set by the EPA based on feasible technology and cost considerations in an attempt to keep the water contaminant concentration as close as possible the MCLG (Maximum Contaminant Level Goal), that is, the level below which there are no known health risks. See EPA Drinking Water Contaminants, http://water.epa.gov/drink/contaminants/index.cfm#1 (last visited Sept. 26, 2010). State environmental agencies also issue their own MCLs. The lack of an established MCL under either federal or state law means no enforceable agency standards exist relating to the chemicals.

[9] The levels of PFOS were higher than PFOA in every well.

reason for ECUA to be concerned at this time." (Doc. 73, Exhibit E, Attachment A.) ECUA executive director Stephen Sorrell (Sorrell) reviewed the test results in December 2006 (before they were published) and, in a Board Report, wrote that the CDM tests "indicated that a problem does not exist and we are well within acceptable limits." (Doc. 73, Exhibit D.) In its 2006 Annual Drinking Water Quality Report, ECUA included results from the CDM testing by listing the average results, noting that PFOA was found at 0.00113 ppb and PFOS was found at 0.0037 ppb. There is no indication that, after the CDM report, ECUA tested or treated its wells for PFOA or PFOS contamination until after it filed this lawsuit.

Roughly eighteen months after the CDM testing, in August 2008, Sorrell informed the ECUA Board that Baron & Budd, P.C., proposed that ECUA join litigation against producers of PFOA and PFOS. Sorrell recommended ECUA's participation because he expected a monetary settlement. Sorrell noted that neither the EPA nor the Florida Department of Environmental Protection (FDEP) had established a MCL for the fluorochemicals but stated ECUA wanted to be proactive because of the potential impact on their supply wells. The ECUA board voted in October 2008 to retain Baron & Budd for litigation related to PFOA and PFOS. ECUA filed this suit in July 2009.[10]

In January 2009, the EPA issued provisional health advisories (PHAs) for PFOA and PFOS. The EPA issues PHAs that "reflect reasonable, health-based hazard concentrations above which action should be taken to reduce exposure to unregulated contaminants in drinking water." (Doc. 113, Exhibit H n.1.) The advisories are promulgated in response to developing situations and are updated as more information becomes available. The EPA set the advisories at 0.4 ppb for PFOA and 0.2 ppb for PFOS. The CDM testing of ECUA's wells reported concentrations well below the advisory levels. 3M calculated that the water with the highest contamination levels, according to the CDM report, the McCallister raw water, contained 8% of the advisory level for PFOA and 57% of the advisory level for PFOS. While the EPA and the FDEP have not established a MCL for

---

[10] This law suit is the first case filed by Baron & Budd relating to PFOA and PFOS.

either PFOA or PFOS, the EPA has added both chemicals to the Third Drinking Water Contaminant Candidate List (CCL3), thus identifying them as unregulated chemicals that are known or anticipated to appear in public waters and may require action under the Safe Drinking Water Act.

In December 2009, the New York Times published an article on tap water quality, noting that, as of the date of the article, although ECUA's water contained multiple contaminates associated with health risks, the water contamination levels had been within acceptable legal limits and not in violation of the Safe Drinking Water Act for the past fifty years. The article quotes Sorrell as saying, "If it doesn't violate the law, I don't really pay much attention to it." (Doc. 73, Exhibit J.) ECUA contends that Sorrell does not remember making such a statement and suggests he was misquoted, at best.

After the New York Times article, on January 11, 2010, Sorrell reported to the Pensacola City Council that there was not a water quality problem in Pensacola. Sorrell explained that the water was safe and did not violate any EPA or FDEP standards. Sorrell also presented a PowerPoint presentation emphasizing that ECUA wells meet all drinking water standards and further noted that EPA MCLs "are our Bible basically." (Doc. 72, ¶¶ 39-40, doc. 106, ¶¶ 39-40.) Sorrell acknowledged that there were 45 unregulated chemicals in ECUA wells but stated that all drinking water in the United States contains unregulated contaminants. The PowerPoint presentation also questioned the motivations of the advocacy group responsible for the tests discussed in the article. Responding to a question about the PFOA and PFOS lawsuit, Sorrell stated that "[w]e do not have an issue at this time, but it's possible we could in the future, and it isn't right for you people to have to pay to clean it up. We believe these chemical companies should have to clean it up." (Doc. 106, ¶ 45) In response to the study conducted by the advocacy group, ECUA commissioned a study by the University of West Florida Center for Environmental Diagnostics and Biomedications (UWF Study). According to a Pensacola News Journal online article, the UWF Study concluded that "the water provided by ECUA offers minimal risk and is safe for human consumption according to Federal and State of Florida standards." (Doc. 98, Exhibit A.) The study also noted that, during the study's time period,

ECUA tested its water system 74,897 times. ECUA maintains that most of these tests were focused on regulated chemicals unlike PFOA and PFOS.

ECUA's primary support for its claims of injury comes from the affidavits of Sorrell (Sorrell Affidavit) and of Kathleen Burns, Ph.D (Burns Affidavit). Sorrell declares that tests have uncovered PFOA and PFOS in certain ECUA wells and that the EPA has classified both chemicals as drinking water contaminant candidates. Sorrell further states that the tested levels of PFOA and PFOS "constitute an unwelcome impurity in the ECUA water supply." (Doc. 109, Exhibit A, Sorrell Affidavit, ¶ 7.) He notes that ECUA did not permit any party to discharge these chemicals into the water supply. Further, "[a]s a result of the PFOA and PFOS levels detected in the recent tests, ECUA has incurred expenses and will incur further expenses in the foreseeable future. Those expenses include testing, monitoring, and filtration costs." (*Id.* at ¶ 9.) Sorrell declares that ECUA is undertaking further tests to determine the extent of the chemicals' presence in the groundwater and may incur additional costs if further PFOA or PFOS is found. Additionally, he suggests that the PFOA and PFOS in ECUA wells will burden the GAC filters. According to Sorrells, although the filters were not installed to deal with fluorochemicals, increased filtration will require more frequent replacement, which can cost tens of thousands of dollars. Finally, Sorrell notes that, in addition to the testing, monitoring, and filtration costs, the presence of PFOA and PFOS may have a negative impact on ECUA's public image.

Kathleen Burns' declaration outlines the potential harm caused by PFOA and PFOS and explores the literature relating to the chemicals' harmful effects. Burns notes that the chemicals remain in the human body for an extended period and, when in the human body, target the thyroid and the liver. Burns points out that the EPA provisional health advisory is based on short term exposure and that a longer term exposure advisory would warrant a lower MCL. She notes that New Jersey established a MCL of 0.04 ppb, 10% of the EPA advisory level, based on long term exposure. Burns notes that the more water an individual drinks, the more likely he is to suffer from exposure, and that, because children and pregnant women are known to drink more water, public health prudence dictates that a water supplier should strive to provide water free of PFOA and PFOS. Burns explains

further that six months of low exposure to PFOS led to abnormal levels of thyroid hormones, cholesterol, and lipoproteins in animals. Without noting the specific level of PFOS, Burns states that lifetime tests of PFOS identify statistically significant levels of liver and thyroid cancers in both males and females as well as mammary cancers in females alone. Additionally, she states that studies of exposure in humans also revealed ill-effects relating to reproductive functions, and that animal testing has shown that PFOS exposure very early in life can damage neurological functions later in life. Burns maintains that PFOA is similarly toxic to the liver and can also damage the heart, brain, blood cells, kidneys, and ovaries. According to Burns, a broad test of 4,000 human adults revealed that women exposed to higher levels of perfluororinated chemicals, including PFOA and PFOS, were more than twice as likely to have thyroid disease. And like PFOS, PFOA exposure can also lead to reproductive and neurological complications.

Burns acknowledges that both PFOA and PFOS are ubiquitous, and thus most people in this country have been exposed to them through inhalation, ingestion, or directly through the skin. She notes that people are exposed to the chemicals through water, food, air, and dust, and that the chemicals have been found in marine and freshwater fish, microwave popcorn, beef, eggs, and canned vegetables.[11] Notably missing from the Burns affidavit is any discussion of the concentrations of PFOA or PFOS in water or in the body that lead to the identified harmful effects. Burns ultimately predicts that the EPA will include an early life exposure protective factor and "establish a far more health conservative [PFOA and PFOS] exposure limit than the short-term provisional level that exists." ((Burns Affidavit, Doc. 109 Exhibit C, ¶ 54.) Burns also suggests that there may be a correlation between the high birth defect rate in Escambia County, specifically for musculoskeletal and heart defects, and PFOS and PFOA exposure, but notes that there is no complete evidence in this regard. Finally, Burns concludes that "[g]iven the potentially serious health consequences of exposure to PFOA and PFOS, and the likelihood that there is no safe level of exposure to these chemicals, it is good public health practice to

---

[11] Dr. Cheremisnoff's declaration also noted that PFOA and PFOS are persistent in the environment and have been detected at low levels in the blood of the general U.S. population.

eliminate PFOA and PFOS from tap water to the degree possible." (*Id.* at ¶ 49.)

**DISCUSSION**

Defendants argue that summary judgment is warranted because (1) ECUA lacks Article III standing based on the absence of an injury-in-fact and also because it cannot demonstrate that its injuries are fairly traceable to the defendants; (2) ECUA's injuries are not supported by a legally cognizable right; and (3) the issue is not ripe for judicial review. The court concludes that ECUA has failed to demonstrate an injury in fact sufficient to confer Article III standing, and therefore concludes the summary judgment motions should be granted. Based on that decision, the court does not address the defendants' other arguments.

Summary Judgment Standard

Summary judgment is warranted when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2). When considering a summary judgment motion, the court must determine the relevant facts and draw all reasonable inferences in support of the nonmoving party. *Garczynski v. Bradshaw*, 573 F.3d 1158, 1165 (11th Cir. 2009) (citing *Scott v. Harris*, 550 U.S. 372, 381 n.8 (2007)). However, the court should only draw inferences in favor of the nonmoving party "'to the extent supportable by the record.'" *Id.* (quoting *Scott*, 550 U.S. at 381 n.8).

The moving party bears the burden of demonstrating to the court the absence of disputed material facts and the basis for summary judgment through pleadings, discovery, disclosures on file, and supporting affidavits. *Norfolk S. Ry. v. Groves*, 586 F.3d 1273, 1277 (11th Cir. 2009) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)), *petition for cert. filed*, 78 U.S.L.W. 3612 (Apr. 6, 2010) (No. 09-1212). In response, the nonmoving party must demonstrate the existence of disputed material facts in the record. *Id.* "The non-moving party must set forth, by affidavit or other appropriate means, specific facts showing a genuine issue of material fact." *LeBlanc v. Unifund CCR Partners*, 601 F.3d 1185, 1189 (11th Cir. 2010) (citing Fed. R. Civ. P. 56(c)); Celotex, 477 U.S. at 323-24.

"A genuine dispute requires more than 'some metaphysical doubt as to the material facts.'" *Garcynski*, 573 F.3d at 1165 (quoting *Scott*, 550 U.S. at 380). Further, "[a] mere scintilla of evidence is insufficient; the non-moving party must produce substantial evidence in order to defeat a motion for summary judgment." *Id.* (internal marks omitted). Similarly, conclusory allegations are insufficient to create genuine issues of material fact. *Leigh v. Warner Bros., Inc.*, 212 F.3d 1210, 1217 (11th Cir. 2000). "The court will not weigh the evidence or make findings of fact; instead the court's role is to determine if there is sufficient evidence upon which a reasonable juror could find for the non-moving party." *LeBlanc,* 601 F.3d at 1189 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

Standing

The case-or-controversy requirement of Article III of the Constitution requires that a plaintiff have standing to sue. *Amnesty Int'l v. Battle*, 559 F.3d 1170, 1177 (11th Cir. 2009) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)). "Standing doctrine serves to ensure, among other things, that the scarce resources of the federal courts are devoted to those disputes in which the parties have a concrete stake." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 191 (2000). Standing is addressed independently of the merits of the plaintiffs' claims. *Amnesty*, 559 F.3d at 1177. Further, "[s]tanding is to be determined as of the time the plaintiff's complaint is filed, and is not altered by events unfolding during litigation." *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1352 n.3 (11th Cir. 2005) (internal marks omitted); *see also Friends of the Earth*, 528 U.S. at 180 (addressing whether plaintiffs had standing at the time the case was filed). For standing to exist, (1) "the plaintiff must have suffered, or must face an imminent and not merely hypothetical prospect of suffering, an invasion of a legally protected interest resulting in a concrete and particularized injury;" (2) the plaintiff's injury must have been caused by or be traceable to the defendant's actions; and (3) the injury must be redressable by the court. *Common Cause/Georgia v. Billups*, 554 F.3d 1340, 1349 (11th Cir.) (internal marks omitted), *cert. denied*, 129 S. Ct. 2770 (2009). The Eleventh Circuit has recognized that "[a]lthough each of these concepts may blend into

the others, the most important is the injury requirement." *Cone Corp. v. Fla. Dep't of Transp.*, 921 F.2d 1190, 1204 (11th Cir.), *cert. denied*, 500 U.S. 942 (1991).

"A plaintiff is deemed to have suffered an injury in fact -- an invasion of a judicially cognizable interest -- when he demonstrates a harm that is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical." *Elend v. Basham*, 471 F.3d 1199, 1207 (11th Cir. 2006) (internal marks omitted); *see also Raines v. Byrd*, 521 U.S. 811, 819 (1997) (noting that the plaintiffs must suffer an invasion of a legally protected interest). "No legally cognizable injury arises unless an interest is protected by statute or otherwise." *Bochese v. Town of Ponce Inlet*, 405 F.3d 964, 980 (11th Cir.) (internal marks omitted), *cert. denied*, 546 U.S. 872 (2005). Further, "[a]lthough 'imminence' is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes -- that the injury is 'certainly impending.'" *Lujan*, 504 U.S. at 565 n.2 (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)). The burden is on the plaintiff to provide specific, concrete facts demonstrating actual or imminent harm from defendant's actions. *Bochese*, 405 F.3d at 976; *see also Lujan*, 504 U.S. at 561 (party invoking jurisdiction bears burden of proving elements). The court "should not speculate concerning the existence of standing, nor should [it] imagine or piece together an injury sufficient to give plaintiff standing when it has demonstrated none. The plaintiff has the burden to clearly and specifically set forth facts sufficient to satisfy Art. III standing requirements." *Bochese*, 405 F.3d at 976 (alteration omitted). The elements of standing "must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, i.e., with the manner and degree of evidence required at the successive stages of the litigation." *Lujan*, 504 U.S. at 561. Moreover, at the summary judgment stage, the plaintiff must provide specific facts set forth by affidavit or other evidence to survive a standing challenge. *Id.* (citing Fed. R. Civ. P. 56(e)).

Analysis

Defendants contend that, because PFOA and PFOS were not present in ECUA wells above MCL (maximum contaminant level) levels, or even PHA (provisional health

advisory) levels at the time ECUA filed its law suit in this case, ECUA cannot show that it has suffered an injury in fact.[12]  In other words, according to the defendants, ECUA has no legally protected right to have its wells free of PFOA and PFOS at such low concentrations, and the presence of the chemicals at the levels shown on this record has not caused ECUA any demonstrable harm or injury.  ECUA responds that the relationship between the chemicals and the MCL is not dispositive on whether a water supplier has suffered an injury, and, argues that it has been injured by the sheer presence of these chemicals in its water supply.

In *Iberville Parish Waterworks Dist. No. 3 v. Novartis Crop Protection Inc.*, 45 F. Supp.2d 934 (S.D. Ala. 1994), *aff'd without opinion*, 204 F.3d 1122 (11th Cir. 1999), two public water suppliers brought suit against a manufacturer of Atrazine related products.[13] The suppliers contended that the presence of Atrazine in their water supplies, due to defendant's manufacturing, forced or would force the suppliers to expend considerable sums to filter their water.  *Id.* at 936.  The suppliers claimed they were also forced to test raw water to determine the appropriate treatment.  *Id.*  The EPA had previously identified Atrazine as an environmental hazard and established a MCL of 3 ppb and required public water systems to test finished water before delivering it to the public. *Id.* at 937-38.  The record reflected that the best method for removing Atrazine from the water supply was through GAC filtration, but that two less expensive (and generally less effective) methods were available.  *Id.* at 938.

The first plaintiff water supplier filtered its water for Atrazine using the less effective methods.  *Id*. at 938.  Its board determined that, although the average Atrazine level did not cross the MCL, its contamination level fluctuated uncomfortably close to the MCL,[14] and

---

[12]  In its complaint, ECUA alleged that the levels of PFOA and PFOS in its wells were above the federally mandated levels but subsequently attributed this statement to pleading error.

[13]  The complaint of the water supplier plaintiffs in *Iberville* included six counts against the manufacturer similar to the counts in this case: strict products liability, negligence, strict liability for abnormally dangerous activity, trespass, nuisance, and unjust enrichment.  *Iberville*, 45 F. Supp.2d at 936-37.

[14]  The EPA MCL guidelines consider the average annual contaminant level when determining whether the MCL has been breached. *See Iberville*, 45 F. Supp.2d at 939.

thus its filtration system needed to be upgraded with a GAC system to effectively filter Atrazine. *Id.* at 938-39. To support its claim of injury, the supplier relied on testimony from its director who in turn relied on an expert report and purported information from state officials to conclude that the water was contaminated with Atrazine. *Id.* at 939. The court rejected the director's conclusion because the expert report noted that there was "no risk of systemic toxicity" in the water and because additional statements by state officials contradicted the statement the director purportedly received. *Id.* The court also noted that the defendant and the state, not the plaintiff supplier, bore the cost of testing the raw water. *Id.* at 938. The second plaintiff water supplier planned to install a GAC system for reasons unrelated to the presence of Atrazine. *Id.* at 940. This supplier drew water from two alternate sources throughout the year and accordingly tested raw water to determine from which source to draw. *Id.* The court noted that there was no evidence that the second supplier tested raw water for Atrazine purposes. *Id.*

The court in *Iberville* ruled that the first plaintiff water supplier did not show an injury in fact because it "suffered no concrete and particularized invasion of a legally protected interest." *Id.* at 941. The supplier suffered no such injury because there was no evidence that the Atrazine in its water exceeded regulations promulgated by the EPA. *Id.* Similarly, the second plaintiff supplier demonstrated no injury because it was never out of compliance and its GAC filter was installed for other reasons. *Id.* According to the court, "[w]ithout any indication of an imminent and nearly certain threat of injury, both Plaintiff's claims amount to little more than conjecture and are claims for which no standing will lie." *Id.* at 942. Therefore, the court determined that neither plaintiff had standing to seek recovery for costs incurred while removing Atrazine from the water supply.[15] *Id.* at 943. The court decided further that neither plaintiff could recover costs for treating raw water because the EPA did not mandate the testing of raw water, only treated water.[16] *Id.* at 944-

---

[15] The court declined to review the 'fairly traceable' and 'redressability' elements of standing after concluding that the plaintiffs lacked a sufficient injury-in-fact. *Iberville*, 45 F. Supp.2d at 943.

[16] The *Iberville* court also noted that the first supplier did not pay for the testing of raw water and that second supplier had already tested raw water for alternate purposes. *Iberville*, 45 F. Supp.2d at 943-44.

45. Finally, the court ruled that, even had the plaintiffs shown standing, their claims were not ripe because the claims rested on a future event, the Atrazine rising above the MCL, something that may or may not occur. *Id.* at 944.

ECUA asks the court to adopt the reasoning of the court in, *In re Methyl Tertiary Butyl Ether (MTBE) Products Liability Litigation*, 458 F. Supp.2d 149 (S.D.N.Y. 2006), another case involving chemical contaminants in a public water supply. The defendants, who used the gasoline additive MTBE in their manufacturing process, moved for summary judgment against the plaintiff water suppliers,[17] arguing that the plaintiffs did not have standing because the contamination did not invade any legally protected interests of the plaintiffs and thus the plaintiffs had not suffered an injury in fact. *Id.* More specifically, the defendants argued there could be no legally cognizable injury when the contaminant level in the plaintiffs' wells was below state and federal MCLs. *Id.* at 154. The plaintiffs argued in response that their interest in providing safe water was not limited by the relevant MCLs, and further that, because they were obligated to supply compliant water, they were injured by having to incur expenses to monitor and remediate the contamination. *Id.* at 154-55.

The *MTBE* court reviewed relevant case law and concluded that there is no mandated bright-line rule that a MCL defines a legally protected interest. *Id.* at 155. The court distinguished several cases where the MCL had defined the injury as relating to individual plaintiffs and not water suppliers. *Id.* The court noted that as public water suppliers the plaintiffs had a statutory duty to protect or remediate groundwater which individual plaintiffs do not have. *Id.* The court distinguished *Iberville* by noting that "the [*Iberville*] court's decision was influenced, at least in part, by the fact that little, if any, of the treatment or remediation expense incurred by the plaintiffs was due to the alleged contamination." *Id.* at 156. The plaintiffs in *In re MTBE*, conversely, provided evidence of

---

[17] *In re MTBE* includes plaintiff water suppliers from New York and California and defendant businesses in New York and California, which had been joined together in multi-district litigation. *See In re MTBE*, 458 F. Supp.2d at 149, 151.

expenditures in treating and monitoring contaminated groundwater.[18]  *Id.*  The court concluded that "while the MCL may serve as a convenient guidepost in determining that a particular level of contamination has likely caused an injury, the MCL does not define *whether* an injury has occurred."  *Id.* at 158.  The court considered summary judgment premature and denied the motions.  *Id.* at 160.

The defendants urge this court to adopt *Iberville* and apply a bright-line MCL rule to conclude that plaintiff has suffered no injury to a legally protected interest because the record in this case shows that the chemicals did not exceed any federal or state MCL.[19] This court need not decide whether a bright-line injury rule controls because here, as in *Iberville*, not only did the contamination levels not exceed the MCL, but additional undisputed facts show that ECUA has not suffered any injury as a result of the presence of these chemicals in its water supply.  First, for example, it is undisputed that ECUA's water supply has never been contaminated above any EPA advisory level, at least not due to PFOA and PFOS.  Further, ECUA has not provided expert testimony establishing that the existing levels were harmful. In fact, in this case, as in *Iberville*, scientific reports demonstrate that the contaminant levels were safe.  *See Iberville*, 45 F. Supp.2d at 939; CDM Report (doc. 73, Exhibit E); UWF Report (doc. 98, Exhibit A). Although the Burns affidavit discusses at length the *potential* harmful effects of PFOA and PFOS on human health, it does so only in general terms; the affidavit lacks any discussion of the requisite contaminant levels necessary to produce harmful effects in humans, and notably makes no connection between the levels in ECUA's wells and any dangerous conditions.

ECUA claims it has suffered injuries from increased monitoring and testing costs, potentially increased GAC filtration changes, and damage to its public image and also that the presence of the chemicals themselves constitute an unwelcome invasion and thus an

---

[18] In distinguishing *Iberville*, the *In re MTBE* court notably did not draw attention to the statutory duties mandating testing in New York and California and the lack of any similar mandate on the water suppliers in *Iberville*. *See In re MTBE*, 458 F. Supp.2d at 156.

[19] Although the *Iberville* decision was affirmed by the Eleventh Circuit, it is a Table decision affirming without opinion.  *See Iberville Parish Waterworks v. Novartis Crop Corp.*, 204 F.3d 1122 (11th Cir. 1999) (Table).

injury. ECUA, however, has come forward with nothing to support its claim in this regard, much less specific, concrete facts, as required at the summary judgment stage. *See Bochese*, 405 F.3d at 976; *see also Garczynski*, 573 F.3d at 1165 (citing *Scott*, 550 U.S. at 381 n.8, and noting that the court draws inferences in favor of the nonmoving party only "*to the extent supportable by the record*").[20]  There is no evidence that in July 2009, when ECUA filed its claim, it had suffered or would imminently suffer injuries from increased monitoring and testing costs.  The Sorrell Affidavit states that "ECUA has incurred and will incur further expenses in the foreseeable future" for the monitoring and testing of PFOA and PFOS in the water.  (Doc. 109, Exhibit A, ¶ 9.)  However, ECUA has presented no evidence that it tested for PFOA or PFOS in its water between the late-2006 CDM testing and the July 2009 filing of this suit.  The 2006 CDM testing is the only time that ECUA tested for perfluourochemicals.  It is noteworthy that ECUA did not test its own wells for either chemical despite 3M's 2001 identification of ECUA wells as potentially containing the chemicals.  It is also noteworthy that the CDM report concluded that ECUA had no cause for concern relating to PFOA and PFOS, and that the UWF report, issued after this suit was filed, similarly concluded ECUA's water was safe.

ECUA now contends it has run further testing.  During oral argument, ECUA's counsel stated that the preliminary results of recent testing show PFOA or PFOS in every well with levels exceeding the EPA's PHA (provisional health advisory levels) in one particular well.  ECUA, however, concedes that this testing was not commenced until after the lawsuit was filed.  The injury-in-fact requirement mandates that the injury exist, or is at least certainly imminent, at the time of filing.  *See Charles H. Wesley Educ. Found.,* 408 F.3d at 1352.  The fact that PFOA or PFOS now appears in an ECUA well does not establish that at the time of filing an injury relating to monitoring and testing costs, or any injury relating to the presence of the chemicals, was imminent.  Given that as of the time

---

[20] ECUA also points to *Rhodes v. E.I. Du Pont De Nemours and Co.*, 657 F. Supp.2d 751 (S.D. W.Va. 2009), as support for its injury argument.  Although the court in *Rhodes* found the plaintiffs had standing even though contaminant levels were below the MCL, the court did so in the context of consumer medical monitoring claims where perceived risk of future harm is sufficient for standing purposes, a factor not present on the record in this case.  *Id.* at 758-60.

this suit was filed, the most recent PFOA and PFOS study (the CDM study) had concluded that ECUA water was safe, and there is no evidence in the record of increasing chemical concentration in ECUA's wells (or any related monitoring) in the interim, the court deems it unreasonable to infer, based on the record, that ECUA wells were at imminent risk of contamination levels above PHA guidelines in July 2009, when this case was filed.[21]

ECUA suggests that Florida Administrative Code sections 62-550.330 and 62-550.521 require public water suppliers, like ECUA, to test and in some situations to remediate unregulated contaminants. These provisions, ECUA contends, mandate ECUA to test and monitor for PFOA and PFOS and thus supply a legally protected interest that defendants have invaded. The court disagrees. Section 62-550.330 mandates that "no contaminant which creates or has the potential to create an imminent and substantial danger to the public shall be introduced into a public water system." Fla. Admin. Code § 62-550.330. At oral argument, plaintiff's counsel suggested that this provision mandates action from water suppliers. However, section 62-550.521 and relevant Florida statutes suggest otherwise. Section 62-550.521 of the Florida Administrative Code requires water suppliers to notify the FDEP of confirmed unregulated contaminants in the water. After notification, the FDEP and the State Health Officer will decide whether the unregulated chemical presents an unreasonable risk to health and accordingly decide whether to direct corrective action including additional monitoring. See Fla. Admin. Code § 62-550.521. This code section plainly indicates that after a water supplier has notified the state of an unregulated contaminant, it has no further duty until and unless the FDEP orders action. See also Fla. Admin. Code § 62-550.300 ("Public water systems shall take necessary corrective action approved by the Department to meet all applicable MCLs, MRDLs, and treatment technique requirements."); Fla. Admin. Code § 62-550.400 (water suppliers shall test for unregulated contaminants when and as directed by the EPA). Further, Florida Statute § 403.853(7) limits mandatory water testing to contaminants for which either the

---

[21] Sorrell's declaration that ECUA has incurred and will continue to incur expenses in monitoring and testing, without supporting evidence, is conclusory and therefore insufficient to establish ECUA's injury at the summary judgment stage. See Leigh, 212 F.3d at 1217 (noting that conclusory affidavit did not provide specific facts to defeat summary judgment).

EPA or the FDEP has set a MCL or for which the EPA or the FDEP "has established a correlation between pollution concentration and human health effects." Fla. Stat. § 403.853(7). Similarly, Florida Statute § 403.855 provides that when the FDEP receives information that a contaminant is entering a public water supply and presents an imminent and substantial danger to the water supply, the *department* may take actions it deems necessary to protect the public health. Fla. Stat. § 403.855 (emphasis added). Considered together, these regulations and statutes make clear that public water suppliers in Florida are only required to monitor or test unregulated contaminants when the FDEP or the EPA instructs them to do so. The EPA maintains a PHA concentration for PFOA and PFOS above the level of either chemical in ECUA wells at the time this suit was filed, and thus the EPA has not forced ECUA action. ECUA has provided no information or evidence indicating that the FDEP has classified PFOA or PFOS as a contaminant requiring such testing and monitoring or that the department has instructed ECUA to instigate any such measures. Further, there is no indication, outside of Sorrell's conclusory affidavit, that ECUA has incurred expenses from testing and monitoring these chemicals. In sum, ECUA has not shown that it must test or remediate its waters for PFOA or PFOS contamination.

Sorrell's allegations regarding ECUA's potential expenses in changing GAC filters are also conclusory and lack specific, concrete facts, other than the concession that the GAC filters were not installed specifically to filter PFOA and PFOS in the water supply. Sorrell insists, however, that the presence of PFOA and PFOS will burden the filters, which will necessitate more frequent replacement at significant cost. However, ECUA provides no further information to quantify this potential expense. Nothing in the record shows how often ECUA typically changes the GAC filters and/or how often ECUA has been forced to change GAC filters since 2006, when the PFOA and PFOS were discovered, or how often, based on expert testimony, such changes may need to occur in the future with the contaminants present. Notably, there is no indication that when the case was filed in July 2009 ECUA had been forced to change a single GAC filter at least in part because of PFOA and PFOS in its water supply. Without supporting evidence, Sorrell's contentions

are at best "conjectural" and plainly do not describe an "actual or imminent" and "concrete and particularized" injury. *See Elend*, 471 F.3d at 1207. As the court explained in *Iberville*, "[w]ithout any indication of an imminent and nearly certain threat of injury, [the water supplier's] claims amount to little more than conjecture and are claims for which no standing will lie."[22] *Iberville*, 45 F. Supp.2d at 941.

Sorrell's public statements further belie ECUA's claims of injury. Sorrell recommended that ECUA join Baron & Burke's litigation because he expected a monetary settlement. During a public city council meeting in January 2010, when asked by an audience member about the current litigation, Sorrell responded that ECUA had no current problem with its water supply but pursued the litigation because it wanted to ensure that defendants would be liable for any future problem. Sorrell reported that ECUA was compliant with state and federal regulations and expressed that the MCL determinations are ECUA's "Bible." (Doc. 72 & DVD.) Sorrell also explained that no water in the United States is free from contaminants, but he assured consumers that they did not need a filter for ECUA provided water. Additionally, the UWF Study funded by ECUA and presented to the public in January 2010 concluded that ECUA water includes "minimal risk" and is "safe for human consumption." (Doc. 98-1, at 2.) Sorrell's statements, in particular his suggestion that ECUA had no current PFOA or PFOS problem relating to the litigation, support the conclusion that ECUA lacks an imminent and concrete injury related to monitoring expenses and/or GAC filtration changes.

Sorrell also states in his affidavit that ECUA's public image may suffer as a result of the PFOA and PFOS contamination. Here, as with his other claims, Sorrell does not provide specific, factual support for his contention. In early 2007, ECUA released information from the CDM report that minor levels of PFOA and PFOS were detected in its wells but that the levels were not cause for concern. ECUA has presented nothing to show how this information has damaged its reputation. ECUA was cited in the December

---

[22] The suggestion that ECUA *may* have a contamination problem requiring remediation at some point in the future is insufficient to establish standing. *See Bochese*, 405 F.3d at 976 (noting that the court should not speculate on the elements of standing).

2009 New York Times Article as having significant unregulated contaminants in its water, and ECUA subsequently commissioned its own study to combat the contentions made in the article.  ECUA does not explicitly argue that PFOA and PFOS led to the article and thus led to ECUA's damaged reputation.  In any event, the article was published after ECUA filed suit, and thus is not relevant to the present standing inquiry.  Whatever the cause of the purported decline in ECUA's public image, there is no evidence of it in the record before the court.  Sorrell's suggestion of a possible decline in ECUA's public image based on the presence of PFOA and PFOS in its water supply is pure speculation and thus insufficient to establish standing.  *See Bochese*, 405 F.3d at 976 (noting that the court should not speculate on the elements of standing).

Finally, ECUA contends that the presence of *any* PFOA and PFOS in its water supply constitutes an unwelcome invasion and thus an injury because ECUA has an interest in providing safe water to the public, and the chemical contamination has invaded that interest.  In support, ECUA argues that PFOA and PFOS are harmful to the public, as shown by the Burns Affidavit and the fact that the EPA has listed the chemicals on the CCL3 (that is, the Third Drinking Water Contaminant Candidate List).  As the court has concluded, there is no reliable evidence in this record that these chemicals are associated with harm in humans;[23] nonetheless, even assuming the chemicals are harmful to humans, there is nothing in the record to show at what level they produce such harm and, further, how that level relates to levels in this case.

Nonetheless, assuming the chemicals are generally harmful to humans at a particular level, ECUA is still required to evidence a concrete and particularized injury in fact to itself.  *See Friends of the Earth*, 528 U.S. at 181  ("The relevant showing for purposes of Article III standing, however, is not injury to the environment but injury to the plaintiff.").  It is undisputed that the levels of PFOA and PFOS at the time this suit was filed were compliant with EPA provisional advisories.  ECUA has not established that it is in any way compelled to monitor the chemicals or change its filters absent the EPA or the FDEP

---

[23]  According to Burns, public health practice suggests that PFOA and PFOS should be eliminated from tap water "to the degree possible."  (Doc. 109, Exhibit C, ¶ 49.)

requiring such action, which neither has done.  In fact, at the time this suit was filed, neither agency had promulgated binding regulations concerning these chemicals. Notwithstanding, even if ECUA had been required by regulation to monitor and remediate, it has failed to show any concrete costs or expenditures related to monitoring its water or changing its filters.  ECUA's argument that the chemicals are 'unwelcome' must be accompanied by some evidence of a concrete and particularized harm to ECUA as a result of the chemicals' presence in its water supply.  *See Am. United Life Ins. Co. v. Martinez*, 480 F.3d 1043, 1068 n.16  (11th Cir.) (holding that plaintiffs did not have standing when they did not allege a particularized harm), *cert. denied*, 552 U.S. 990 (2007).  No such evidence exists in this record.

"Standing is a threshold jurisdictional question which must be addressed prior to and independent of the merits of a party's claims."  *Amnesty*, 559 F.3d at 1177 (internal marks omitted).  Because ECUA has not established injury in fact, the court need not address the other elements of standing.  *See Bochese*, 405 F.3d at 980 (declining to consider other elements of standing after plaintiff did not establish injury in fact).  Accordingly, it is hereby ORDERED that Defendants' Motions for Summary Judgment (docs. 70, 95, 103) are GRANTED.  The pending motions for protective order (docs. 60, 64, and 83) are DENIED as moot.  The Clerk is directed to enter final summary judgment in favor of the defendants and against the plaintiff, with costs taxed to the plaintiff.

**DONE AND ORDERED** this 29th day of September, 2010.

s/ *M. Casey Rodgers*

**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**